**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward J. BARRETT, Defendant-
Appellant.**

No. 73-1477.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1974.

Decided Nov. 8, 1974.

Rehearing En Banc Denied Dec. 26, 1974.

Rehearing Denied Jan. 2, 1975.

Robert E. Wiss and Thomas A. Foran, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and Dan K. Webb, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal seeks review of the conviction of Edward Barrett, the County Clerk of Cook County, Illinois, from 1955 to 1973, for violation of 18 U.S.C. § 1341 (mail fraud),[1] 18 U.S.C. § 1952 (interstate travel in aid of racketeering enterprises)[2] and 26 U.S.C. § 7201 (attempt to evade income tax).[3]

I

The County Clerk of Cook County has the responsibility for purchasing and insuring voting machines. In 1954, the State's Attorney of Cook County had rendered an opinion that competitive bidding was not required in the purchase of voting machines inasmuch as it was important to maintain uniformity in all of the County's precincts. Since 900 machines had already been purchased from Shoup Voting Machine Corporation, and no one other than Shoup sold comparable machines, the situation was not adaptable to competitive bidding. The president of the Cook County Board of Commissioners, which is responsible for the management of the affairs of Cook County, testified that the 1954 opinion continued to govern the purchase of voting machines as late as 1971.

The 1954 opinion stated that "you may request a bid from the Shoup Voting Machine Co. only," but that any bid required the approval of the County Clerk and then of the County Board. The president of the County Board testified that from 1967 to 1971, four voting machine contracts covering 1,400 machines were submitted to the Board by the County Clerk, that they were unani-

1. Section 1341 provides in part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. Section 1952 provides in part: "(a) Whoever travels in interstate . . . commerce or uses any facility in interstate . . . commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

\* \* \* \* \*

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified . . . shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) . . . 'unlawful activity' means . . . bribery . . . in violation of the laws of the State in which committed. . . ."

3. Section 7201 provides in part: "Any person who willfully attempts in any manner to evade or defeat any tax . . . or the payment thereof shall . . . be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

mously approved by the Board without debate, and that in casting his own vote the president relied upon the County Clerk "to perform his statutory obligation" as to the need and "the best price for this kind of equipment for the County."

Defendant Barrett had become County Clerk of Cook County in 1955 and continued in that office until 1973, upon his conviction in this case.

The Shoup Voting Machine Corporation began to sell its 10-column, 50-row, vertical voting machines to Cook County in the early 1950's. In 1963 or 1964, the Cook County machines were converted to 6-column machines "to give more room for propositions." Irving H. Meyers, then executive vice president of Shoup, was in charge of the Cook County conversion, which took place in Chicago warehouses where the machines were stored. At that time, Meyers met Barrett.

In July, 1965, the ownership of Shoup was transferred to a group of Philadelphia investors. Meyers became a 10 percent owner and the president of Shoup.

On September 13, 1965, "in accordance with your request for bids," Meyers wrote to Barrett, proposing on behalf of Shoup to sell 250 voting machines to Cook County at $1,791 each. Having received no response, Meyers came to Chicago in December, 1965 and met with Barrett in his County Clerk office. Barrett told Meyers that he did not have the funds to purchase the machines at that time but might have the money in the forthcoming budget. Meyers testified:

I said to Mr. Barrett that any dealings between the Shoup Company and the County of Cook in the future would be between he and I. I told Mr. Barrett that I was committed to pay him five percent cash on all voting machine sales to Cook County.

Mr. Barrett said to me that he was getting more money than that before.

I said to Mr. Barrett that this was a new ball game, and that is all the money that I was committed to pay.

Mr. Barrett said that he wanted $200 per machine.

I hesitated for a moment, and then I said to Mr. Barrett that the only way I could pay him $200 per machine would be to raise the price of the voting machine by $100 to the County of Cook, and that I felt that he could vindicate the $100 increase in price, because Cook County had a bastard type voting machine.

He asked me what I meant by that.

I told him that we made two standard models of machine, and it had been the Shoup policy, whether or not we sold a county one machine or a thousand, the price was always the same. But Cook County had a machine like no other county in the United States. So, therefore, there was nothing to compare Cook County's price against any other price.

Mr. Barrett said that he could take care of the increase. Mr. Barrett said to me, when would he get the money.

I told him, naturally, I would pay him the money after Shoup received the money from the County for the purchase of the voting equipment.

Mr. Barrett said there would be times when he would need money in front.

I said to Mr. Barrett that I would give him half of the money when I received a solid, concrete contract or purchase order from Cook County, and the other half of the money when I received the funds for the payment of the voting machines by our company from Cook County.

He said that would be fine.

I told Mr. Barrett that on any dealings at any time, they would be between he and I alone, that I never wanted to be in a position where there was a third party present, for his protection and also for mine.

Barrett ran for re-election in November, 1966. Meyers made a personal $1,000 campaign contribution, which Barrett acknowledged in two letters, one prior and one subsequent to the election. After the election, Meyers called Barrett to congratulate him. That time Barrett gave Meyers his unlisted home telephone number, which Meyers placed in his personal address book.

In January, 1967, Meyers saw Barrett at the hotel where Barrett was staying in Palm Springs, California. When Meyers asked Barrett when Shoup could expect some business, Barrett replied that he thought there would be some money in the budget and that when Meyers returned to Philadelphia, he should send Barrett a proposal for 300 voting machines.

On January 13, 1967, Meyers sent Barrett a proposal for the sale of 300 voting machines at $1,898 ($107 above the 1965 bid). The proposal was valid to March 15, 1967. Before the expiration date, Meyers telephoned Barrett and was told the County did not have the funds to buy the machines.

Barrett telephoned Meyers in October, 1967 and requested another bid for the 300 machines. The second proposal, sent on October 20, 1967, set the price at $1,890 ($99 above the 1965 bid). The journal of the proceedings of the Cook County Board of Commissioners for November 7, 1967, showed that the Shoup bid of October 20 was unanimously approved by the Board. Shortly thereafter, Barrett advised Meyers by telephone of the Board approval, whereupon Meyers told him that he would come to Chicago.

Meyers flew to Chicago on November 14, 1967 with a blue zippered plastic valise containing $30,000 in cash. At Barrett's prior suggestion Meyers met him at the air terminal where they had lunch together. At the restaurant Meyers put the valise between Barrett and himself and after lunch Barrett picked up the valise with the money and left.

Meyers explained how he acquired the cash which he paid Barrett:

In 1965, when I became president of Shoup, I devised a method of raising cash where there might be purposes of obtaining business where I did not have a legitimate representative, and by paying cash was the only way to receive the business.

The method that I devised was to pay different persons checks to represent Shoup in certain areas where I did not have representation, or to pay by check different professional people, lawyers or so forth for professional fees for services nonrendered.

When I paid these checks to these people they would pay their income tax and then return to me 40 or 50 percent in cash, and at the end of each year I would send out a 1099 form to these people so that they could report —make sure they would report this money on their income tax.

This is the way or the method that I used to raise cash.

The government introduced the records of the travel agency which booked Meyers' flights to and from Chicago on November 14, 1967. They showed that the flight arrived at Chicago O'Hare Airport at 12:17 p. m. and that the return flight to Philadelphia left O'Hare at 2:10 p. m. Telephone records showed a call from Shoup's office to Barrett's unlisted home telephone number on November 13, 1967. Safe deposit company records showed a visit on November 13 to one of two safe deposit boxes in which Meyers kept cash to make payments.

Shoup Corporation received the last payment from Cook County on the 300 machines in early August, 1968. Meyers then called Barrett and arranged to fly to Chicago to see him. On August 9, 1968, Meyers withdrew $30,000 in cash from his safe deposit box, placed it in a brown manila envelope and sealed it, and placed the envelope in a blue plastic valise. He flew to Chicago where Barrett met him at the airport; they had lunch

at the same airport restaurant as before. Again Barrett left the meeting with the valise and the $30,000. Telephone records showed a call to Barrett's County Clerk office on August 7; safe deposit records showed a box entry by Meyers on August 9, 1968.

At the August 9 airport meeting Meyers and Barrett discussed the sale of an additional 300 voting machines. Barrett had called Meyers in April and had said that Cook County needed 300 more machines for the upcoming presidential election but did not have the money. Shortly thereafter Meyers called Barrett and advised him that Shoup could furnish 200 new machines and 100 reconditioned used machines at a rental of $300 per machine for the November election, with an option to purchase the machines and a credit of the rental on the purchase price. A contract incorporating those terms, with the option-sale price fixed at $1,890 per new machine and $1,790 per used machine, was signed by Barrett as County Clerk and by Meyers for Shoup, dated August 8 and approved by the County Board according to its journal on August 9, 1968.

At the meeting at the airport on the 9th, Meyers asked whether Barrett thought that the County would exercise the option to purchase the machines. When Barrett assured him that it would, Meyers told him that he would give him $15,000 in a few weeks and another $45,000 when the County paid for the machines. Barrett agreed to that arrangement.

On August 20, 1968, Meyers telephoned Barrett and told him that he was playing in a Shoup-sponsored golf tournament that week but would send his brother-in-law, Tony Lemisch, "with a package for him." Meyers testified that he had withdrawn $15,000 in cash from his safe deposit box several days before and kept it in a safe in his home. On the 20th, he gave the money to Lemisch in a sealed envelope. Lemisch went to Chicago on that day and delivered the envelope to Barrett in his County Clerk office. Later Meyers telephoned Barrett

to verify his receipt of the money. These dates were also corroborated by records showing a safe deposit entry on August 16 and telephone calls to Barrett on August 20 and 22, 1968.

The option was exercised by Cook County and on February 11, 1969, Shoup Corporation deposited an installment check from the County for $278,500. Two days later on February 13, Meyers, who was on his way to Las Vegas for his daughter's wedding, stopped at Chicago. He had placed $45,000 in a manila envelope, sealed it, and put it in a blue valise. Barrett met him at the airport gate in Chicago, took the valise and left. Meyers continued on to Las Vegas. Records showed that Meyers entered his safe deposit box on February 13, 1969 and that on that date he took a plane from Philadelphia, which landed in Chicago in the afternoon and then continued to Las Vegas.

In October, 1969, Barrett telephoned Meyers and told him that the County was going to purchase 300 more voting machines. Meyers told him that the price had increased and that he would let him know what the new price would be. On November 3, Meyers wrote Barrett advising him that the new price for 300 voting machines was $2,025 per machine. A contract with those terms was signed by Barrett for the County and by Meyers for Shoup Corporation and was approved by the County Board on March 2, 1970. By letter dated March 4, the County Clerk's office advised Meyers that the contract had been approved. A few days thereafter Meyers telephoned Barrett and advised him that near the end of March he was going west and would stop at Chicago.

On March 23, 1970, Meyers withdrew $30,000 from his safe deposit box, sealed it in a brown manila envelope and placed the envelope in a blue vinyl plastic case. He flew to Chicago, met Barrett at the airport and handed him the case with the money. At that meeting, Barrett requested a political contribution because he was running for re-election. Meyers answered that "I gave him a political

contribution every time I gave him a blue valise, and that there was no chance that he would not win re-election anyhow." Barrett smiled and left with the money.

In August, 1970, Meyers advised Barrett that the March order for 300 machines could be filled with excellent used machines at a lower price. Thereafter on August 17, the County and Shoup executed a revised contract at a reduced price of $1,897 per machine. Shoup received a check from Cook County for $189,700 dated August 14, which was deposited on August 20, 1970.

On August 28, 1970, Meyers withdrew $30,000 out of his safe deposit box and went through the customary procedure to deliver it on August 30 to Barrett at the Chicago airport.

The March 23 and August 30, 1970 payments are documented by safe deposit records and used airline tickets purchased by Meyers.

In regard to his paying $180,000 to Barrett in cash, Meyers testified:

I paid this money to Mr. Barrett to insure getting the business, the voting machine business in Cook County. I felt that with Mr. Barrett's recommendation on the purchase of the Shoup voting machines that there would be no problem in passing the board.

In December, 1970, Meyers was subpoenaed to appear before a federal grand jury in Philadelphia and to turn over all Shoup Corporation records. In July, 1971, he was first indicted. In November, 1971, Meyers telephoned Barrett and asked to see him. Barrett agreed, Meyers flew to Chicago on November 9, and the two men had lunch at Club 39.

Meyers brought with him "a brown manila envelope containing my indictments" and told Barrett that he was "in a lot of trouble." Barrett asked if he might become involved and Meyers assured him that he would not. Barrett asked how Meyers obtained the cash he had paid Barrett and Meyers explained

the "conduit system" that he used. He then pleaded with Barrett for more voting machine business, explaining that he had resigned as Shoup president but was the exclusive sales agent for Shoup. Barrett told him that the County would probably be purchasing 500 more machines.

Thereafter, on December 20, 1971, the County approved a contract with Shoup for 500 voting machines at $1,995 per machine. No money was ever paid to Barrett in regard to the last 500 machines.

The purchasing of insurance on the voting machines owned by Cook County was the responsibility of Barrett in his *ex officio* role as Comptroller of Cook County. The Deputy Comptroller was C. R. Hodgman. During the period 1967 through 1971, the voting machine insurance was placed by Hodgman with Arthur J. Gallagher & Company, an insurance agency. Premiums were paid directly to the insurance carrier by Cook County, and the carrier in turn paid a 25 percent commission to Arthur J. Gallagher & Company. The Gallagher firm retained a 10 percent commission, and paid a 15 percent commission to Barrett. Barrett never reported to the County Board that he was receiving these commissions. Although Edward Keating, vice president of Arthur J. Gallagher, testified that the County received the best possible bargain on the insurance, he admitted that the choice was limited to those insurance companies with which the Gallagher firm had an agency agreement. Further, Keating testified that, at the direction of Hodgman, the Gallagher firm was not identified on the insurance policies, contrary to the customary procedure. Barrett was an insurance broker who received commissions on other business. During the period 1968 through 1970 approximately $6,000 of his $17,000 in commissions was on voting machine insurance.

The use of the mails consisted of the mailing of checks by Cook County to the insurance companies, and the mailing of

checks by the insurance companies to the Gallagher firm.

Barrett was named in a 16-count indictment returned on September 28, 1972. The first six counts charged violation of the Travel Act (18 U.S.C. § 1952), in that Barrett had caused officials of Shoup Voting Machine Corporation to travel in interstate commerce for the purpose of receiving bribes from those officials to influence his acts as County Clerk of Cook County. The next four counts charged Barrett with violation of 26 U.S.C. § 7201 by filing false and fraudulent income tax returns for 1967, 1968, 1969 and 1970, in that he understated his taxable income in each of those years. The final six counts charged Barrett with violation of 18 U.S.C. § 1341 by using the mail to further a scheme to defraud the people of Cook County by causing insurance brokers' commissions to be paid to him upon premiums paid by the County for insurance coverage of its voting machines.[4] The last six counts were dismissed and replaced by similar counts in a superseding indictment returned on January 10, 1973.

The trial commenced on February 22, 1973. The jury returned a verdict of guilty on all counts. Barrett was sentenced to three years' imprisonment on each count, the sentences to run concurrently, and was fined a total of $15,000.

## II

Defendant Barrett first complains of prejudicial publicity.

On February 22, 1973, the day the trial commenced, defendant moved for a continuance on the basis of three types of newspaper publicity. The first type consisted of stories which appeared when the indictment was returned on September 28.

In United States v. Hoffa, 367 F.2d 698, 711 (7th Cir. 1966), vacated on other grounds 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967), we pointed out:

> Whenever any person of prominence is charged with a crime, the story usually will receive wide distribution through various news media. It may be impracticable to postpone the trial for a period long enough for public interest to die down. . . .

Here defendant was a prominent political figure in Chicago and Cook County, having served as County Clerk for 18 years.

The news stories (1) discussed the indictment and did not go beyond the language of the indictment, (2) discussed defendant's political career and in that respect were favorable, and (3) contained self-serving and lengthy comments by defendant and his attorney proclaiming his innocence. This group of stories appeared five months prior to the trial.

A second group of news stories appeared from February 9 thru 15, 1973 and dealt with the insurance premiums on City of Chicago business received by an insurance firm employing the son of the mayor of Chicago, court receivership positions obtained by the president of the insurance firm, and the insuring of receivership properties. Defendant Barrett was not named in this group of news items.

The third group of news stories related to the jury verdict returned in the same Chicago federal court building on February 20, finding former Illinois governor and court of appeals judge Otto Kerner guilty of various crimes including bribery, mail fraud and income tax violations. These stories did not mention Barrett.

At the beginning of the voir dire examination of prospective jurors on February 22 in this case, the district judge strongly emphasized that he was seeking "a fair and impartial trial based entirely on what transpires in this courtroom from now on and not based in any way

---

4. *See* notes 1–3, *supra,* for text of the pertinent portions of the three statutes which Barrett was charged with violating.

or influenced by anything that has occurred in other courtrooms in this building." The judge then asked the panel of venirepersons:

> Having in mind the recent publicity in regard to the other cases where there were some similar charges, is there any of the jurors who feel that publicity and the knowledge that you gained from that publicity, would have an effect on your verdict in this case?

No one responded. In personally examining the first prospective juror in the presence of the entire panel, the judge asked:

> Have you formed any opinions about this case by virtue of any newspaper or television publicity, either in regard to this particular case or any other cases that have been recently tried that would affect your verdict in this case?

When additional panels of venirepersons were brought into the courtroom on two subsequent occasions, the judge reemphasized the same conditions of impartiality. Each juror eventually selected to serve on the Barrett jury was personally asked whether he would base his judgment only on what transpired in this courtroom during this trial and not what he might have read about or what he heard had occurred in other courtrooms.[5]

Defendant's counsel was permitted to question the jurors. He accepted the panel, each of whom had been interrogated concerning pre-trial publicity and the effects of other trials of political personages. At no time did defendant's counsel seek a change of venue.

▬ That the public attitude toward general political corruption may appear to be more severe at one time than another does not justify a moratorium on the prosecution of crimes by po-litical figures, absent pervasive prejudicial publicity and failure to screen prospective jurors. Here the pre-trial publicity was not extremely pervasive, much of it was directed to political figures other than the defendant, and that concerning the defendant did not go beyond reciting the charges of the indictment. Most importantly, each prospective juror was carefully screened to expose any possible prejudice. The district judge was correct in denying the motion for a continuance.

The jury was selected and sworn in on Friday, February 23, 1973, but the opening statements were not to begin until Monday, February 26. On Friday, defendant's counsel agreed that the jury need not be sequestered over the weekend:

> Let's wait until Monday morning and let the jury go home, get their gear together and they won't have anything that would tempt them to discuss the details of this case.

When the district judge excused the jury for the weekend, he admonished the jurors as follows:

> I am advising you now not to read anything about this case in the paper, not to listen to anything about this case over radio or television.
>
> I don't know what they could tell you that you haven't heard in the courtroom, except that we got a jury, and you know that already. So that I don't see how anything you might read would have any effect on you.
>
> But regardless of that, I admonish you not to read anything about it, not to discuss this case with anyone at home.
>
> There are some who, I am sure, will have people say, what are you doing, and when you tell them, they will say, "Well, if I was on the jury, this is what I would do."

---

5. Barbara M. Schoors (Tr. 52–55) ; Deanetta Mensink (Tr. 64–66) ; Eli Rungaitis (Tr. 80–83) ; Robert J. Peters (Tr. 85–87) ; Richard E. Vincent (Tr. 117–21) ; Edward Liechtenhagen (Tr. 131–33) ; Vera C. Lynch (Tr. 140–43) ; Charles O. Cash (Tr. 160–62) ; Charlotte R. Bogdan (Tr. 226–29) ; Joseph E. Kerwin (Tr. 232–35) ; Robert C. Smart (Tr. 247–50) ; and Kenneth N. Pearson (Tr. 258–61).

Well, I don't want you to listen to people who are not on the jury to find out what you should do. So just tell them that in a couple weeks or less you will be able to tell them everything, but you don't want any preliminary advice from people at home or from people that you will meet socially over the week end [sic].

I am going to question you again on Monday morning as to whether you have followed my admonition in regard to not discussing the case, not reading about it, not listening to it . . . .

On Monday, the court asked the jury:

First of all, ladies and gentlemen, last Friday I admonished you to conscientiously and purposefully avoid reading about anything over the weekend involving this case, or to listening to anything on radio or TV involving this case.

Is there anyone on this jury that failed to comply with my request? If so, raise your hand.

No one responded.

Over the weekend one Chicago newspaper carried an article describing the United States Attorney's investigations of various local politicians, including both Kerner and Barrett. A second article was a comparison between Kerner and Barrett, their personalities, trial strategy, and the charges against them. The article speculated that the Barrett verdict would depend on whether the jury believed Meyers or Barrett, but noted it was unlikely that Barrett would testify. Defendant moved for a mistrial on the basis of these articles.

■ Each case of alleged prejudicial publicity must rest on its "special facts." United States v. Jannsen, 339 F.2d 916, 920 (7th Cir. 1964). "The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it. Moreover, the judge's response is to be

commensurate with the severity of the threat posed." United States v. Thomas, 463 F.2d 1061, 1063 (7th Cir. 1972). As we stated in Margoles v. United States, 407 F.2d 727, 735 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed. 2d 84 (1969):

Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further. . . .

The district court followed this procedure.

■ Given the Friday admonitions and the negative responses of the jurors on Monday morning, the district court could reasonably conclude that no juror had read any of the weekend publicity. He did not err in refusing to declare a mistrial.

### III

The defendant contends that his conviction on the bribery charges was contrary to law and a violation of his due process right to a fair trial in that the court failed to suppress illegally obtained evidence.

The only important witness against defendant on the bribery charges was Irving H. Meyers. Defendant filed a pre-trial motion to suppress Meyers' testimony [6] because it was induced by the government's promise of civil tax immunity on the $700,000 which passed through his safe deposit boxes.

■ The government's promise was one of the terms of the plea bargaining

---

6. The motion also applied to the testimony of Anthony Lemisch, a minor witness who

made a similar bargain in the Pennsylvania trial.

deal negotiated with Meyers in his criminal trial in Pennsylvania. Meyers' part of the deal was to plead guilty to several counts of conspiracy and mail fraud and to two counts of filing false income tax returns which did not report as taxable income portions of the $700,000 fund. Meyers also agreed to testify in other proceedings about what happened to the $700,000. In return, the government recommended a sentence on all counts of one year and a day, to be imposed under a statute [7] making Meyers immediately eligible for parole, and to be served at the detention facility at Eglin Air Force Base, Florida. The government also granted Meyers transactional immunity to preclude state prosecutions. In addition, the Pennsylvania prosecutor recommended to the I.R.S. that it exempt Meyers from civil tax liability on any part of the $700,000 which he would testify under oath he had paid as bribes or political contributions to public officials.[8]

The theory of defendant's motion was that the government in effect had paid Meyers one million dollars to testify against defendant and other public officials. Each time he testified, Meyers was relieved of the obligation to pay income tax and fraud penalties on whatever amount of the cash he said he gave to the official. Defendant claims this arrangement violates 18 U.S.C. § 201(h):

Whoever, directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath . . . given or to be given by such person as a witness upon a trial, hearing, or other proceeding . . . [s]hall be fined not more than $10,000 or imprisoned for not more than two years, or both.

Because Meyers' testimony was obtained through inducement in violation of section 201(h), defendant argues, the testimony should have been suppressed.

Instead, the trial court denied the motion but allowed defendant to impeach Meyers on cross-examination by bringing out all the terms of the plea bargain.[9] Counsel was allowed to argue to the jury that the civil tax immunity agreement gave Meyers a motive to lie about giving $180,000 to the defendant.

The premise of defendant's argument for suppression is that the government has no authority to allow civil immunity in return for testimony. He concedes that a prosecutor would not violate section 201(h) by granting criminal immunity, because 18 U.S.C. § 6002 gives the government that power. But granting unauthorized civil immunity, according to the defendant's argument, is giving a witness something of value for his testimony in contravention of section 201(h).

Both parties' briefs overlook 26 U.S.C. § 7122:

(a) Authorization.—The Secretary [of the Treasury] or his delegate may compromise any civil or criminal case

---

7. 18 U.S.C. § 4208(a)(2).

8. One peculiar aspect of this bargain is the inconsistency in the government's indicting and convicting Meyers for failing to report some of the safe-deposit-box cash as taxable income to himself, and at the same time excusing his civil tax liability on that income. The government does not attempt to explain the contradiction, except at oral argument it did contend that Meyers should have reported the cash as gross income and deducted the bribes as a business expense. Of course such an expense is not deductible. 26 U.S.C. § 162(c); Dixie Machine Welding & Metal Works, Inc. v. United States, 315 F.2d 439 (5th Cir.), cert. denied, 373 U.S. 950, 83 S. Ct. 1679, 10 L.Ed.2d 705 (1963). Besides,

Meyers was convicted of falsifying his taxable, not his gross income.

9. The decision in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requiring the government to disclose a promise of leniency made to a key witness in return for his testimony, implies that suppression is not an appropriate remedy. See United States v. Isaacs, 347 F.Supp. 763, 767 (N.D.Ill.1972), where the court added: "We would expect the Court in Giglio not to have ordered a new trial, or alternatively to have ordered suppression of Taliento's testimony in a second trial, if the Government's reward of leniency warranted suppression."

arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense.

It is not clear from the record whether the prosecutors or the I.R.S. representatives were, or believed they were, acting under this statute. Since the case was in the hands of the Justice Department, the Attorney General could have compromised Meyers' civil tax liability without approval of the I.R.S. From the record, it appears that both agencies thought I.R.S. approval was necessary. Whether the government has effectively bound itself to a compromise of Meyers' civil tax liability is a matter between Meyers and the government.

■ The significance of section 7122 for defendant is that the end the government was seeking to accomplish— Meyers' exemption from civil tax liability—was authorized by law. If the government can excuse criminal *or* civil liability in settling a criminal case, surely it can use that power of compromise to obtain guilty pleas or to procure testimony in other proceedings. Both are legitimate objectives of plea bargaining.

■ Because the Justice Department is empowered to grant both civil and criminal immunity in tax cases, such a grant to a prospective witness cannot be considered to violate section 201(h).[10]

Defendant's alternate argument for suppression of Meyers' testimony is that the inducement of civil immunity when added to the normal unreliability of accomplice testimony constituted a denial of due process. Our holding that there was no illegal inducement deflates this contention considerably.

The two cases defendant relies on do not compel suppression of Meyers' testimony. The court in United States v. Fishel, 324 F.Supp. 429 (S.D.N.Y.1971), suppressed a tape recording of an alleged bribery transaction. The government had lost two earlier recordings of conversations which the defendant claimed would have established that he had been entrapped. Suppression of the tape (but not the testimony of the conversants) was the only available remedy in *Fishel*, because no amount of cross-examination of government witnesses about the earlier conversations would have had the impact that the third tape recording would have had on the jury. In the present case, cross-examination of Meyers fully amplified defendant's theory of Meyers' possible motivations for

---

10. The government's justification for granting civil liability was a denial of giving Meyers "anything of value." It argued that Meyers was a mere "conduit," not the beneficial recipient of the cash; therefore the cash was not taxable income to him. There is obvious difficulty in squaring this explanation with the fact of Meyers' conviction (see note 8, supra). Moreover, the question whether the cash was income to Meyers is a close one that cannot be settled on this record.

On the one hand, Meyers could be considered an agent of Shoup Voting Machine Corporation in raising cash through false vouchers to the company and in using the cash to bribe public officials to buy Shoup voting machines. *Cf.* Boyle, Flagg & Seaman, Inc., 25 T.C. 43 (1955); Paul A. Gorin, T.C. Memo 1968–57; Eph H. Hoover, Jr., T.C. Memo 1968–49; Patrick H. Smith, T.C. Memo 1964–274.

But Meyers, president and 10 percent shareholder of Shoup, carried out his scheme with the knowledge of only one other shareholder, the secretary-treasurer and a salesman. One could argue Meyers embezzled the cash from Shoup, took complete control of it and used it to boost his own sales record. *Cf.* Estate of Geiger v. Commissioner of Internal Revenue, 352 F.2d 221 (8th Cir. 1965), cert. denied, 382 U.S. 1012, 86 S.Ct. 620, 15 L.Ed.2d 527 (1966); Barbara M. Bailey, 52 T.C. 115 (1969); Ernestine K. Alcorn, T.C. Memo 1969–147.

The record does not show to what extent Meyers controlled Shoup, nor what effect the cash drain to the fraudulent payees and the public officials had on the company's profit margin. Without such information, we cannot say whether Meyers was acting more for Shoup or for himself.

lying. His testimony was not so tainted by government misconduct that its admission violated due process.

In United States v. Haderlein, 118 F. Supp. 346 (N.D.Ill.1953), the trial court directed a verdict of acquittal after hearing the uncorroborated testimony of a coconspirator who had been threatened with revocation of citizenship and who admitted perjury in connection with the very facts to which he testified. *Haderlein* is distinguishable from the present case by the elements of government coercion, the witness' admission of perjury and the total lack of corroboration. Further, the trend of recent cases suggests that the court in *Haderlein* would have been justified in allowing the jury to hear all the evidence impugning the witness' motives and veracity and to decide his credibility for itself. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Tanner, 471 F.2d 128 (7th Cir. 1972); United States v. Isaacs, 347 F. Supp. 763 (N.D.Ill.1972).

■ Because the government was authorized to grant Meyers civil tax immunity and because the defense was allowed to bring out all the terms of the plea bargain to the jury, use of Meyers' testimony did not deprive the defendant of a fair trial.

### IV

Defendant contends that the conviction on the six mail fraud counts cannot stand because (1) active fraud rather than constructive fraud must be proved, (2) actual injury, or the capability thereof, must be proved, and (3) Illinois law does not require that the money received by defendant be turned over to the County.

Virtually every argument by the defendant has been answered by Judge Cummings' careful and detailed treatment of a closely analogous fact situation in United States v. George, 477 F. 2d 508 (7th Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973).

In *George* the purchasing agent for Zenith Radio Corporation received approximately one-third of spurious commissions paid to a third party by a supplier of cabinets for Zenith. Zenith had a conflict-of-interest policy providing that no gratuities of any nature were to be bestowed on its Purchasing Department employees by suppliers. Despite the facts that the kickbacks did not "come out of Zenith's pockets," that the purchasing agent did not request any preferential treatment for the supplier, that the supplier was not given any preferential treatment beyond receiving the cabinet business, that the supplier's prices to Zenith were fair and reasonable and within Zenith's general guidelines for its suppliers' prices, that Zenith was never shown to be dissatisfied with the cabinet supplier's products or prices, and that the purchasing agent insisted on efficiency and quality from the supplier, nevertheless this court affirmed the conviction of the purchasing agent, supplier and the third party under the mail fraud statute.

The court held that Zenith was deprived of its employee's honest, faithful and loyal performance of his duties to the extent that he secretly profited from his agency and concealed from Zenith the knowledge that its supplier was willing to sell the cabinets for a lesser net price. "It is preposterous to claim that Zenith would have spurned . . . [the] discount [paid by the supplier to the third party] if offered." 477 F.2d at 513.

The court in *George* held that "[t]he mail fraud statute delineates two essential elements constituting the crime: a scheme to defraud and use of the mails in furtherance of the scheme." 477 F.2d at 511. None of the three participants disclosed the arrangement to Zenith. The court found the existence of not only a scheme to defraud and a capability of injury to Zenith, but of actual fraud and actual injury. "[T]he fraud consisted in [the purchasing agent's] holding himself out to be a loy-

al employee, acting in Zenith's best interests, but actually not giving his honest and faithful services, to Zenith's real detriment." 477 F.2d at 513.

In the present case, as in *George*, no issue is raised as to the sufficiency of the evidence to establish use of the mails, nor could there be.[11]

Instead of a private company's conflict-of-interest policy, here there is the state policy in regard to its public officials.[12] "No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an [sic] one must in the federal law be considered a scheme to defraud." Shushan v. United States, 117 F.2d 110, 115 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L. Ed. 1531 (1941). As a specially designated panel of this court recently said in applying the mail fraud statute to an Illinois public official, "[t]he citizens of Illinois were defrauded of Kerner's honest and faithful services as governor." United States v. Isaacs, 493 F.2d 1124, 1150 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

Both the Cook County purchasing agent and the chief deputy Cook County clerk testified that during the times involved here the full responsibility for obtaining insurance on voting machines owned or rented by Cook County was vested in the defendant Barrett in his position as Cook County Clerk (Tr. 1022, 1028–29). The president of the Cook County Board of Commissioners testi-

fied that Barrett never disclosed to him that he was receiving insurance brokerage commissions on the County's voting machines (Tr. 1088–89).

The vice president of Arthur J. Gallagher & Company, which since 1961 received a 25 percent commission upon the insurance covering Cook County voting machines and delivered 15 percent of that commission to Barrett, was called as a witness by Barrett. Upon cross-examination, the witness testified that, although insurance policies should be countersigned by the resident agents, he was advised in 1961 by the deputy comptroller under Barrett to make certain that the name of the Gallagher firm did not appear on any of the voting machine insurance policies (Tr. 1298). He also testified that although the County received the best possible rates, the choice of companies was limited to those insurance companies which the Gallagher firm represented through an agency agreement (Tr. 1295).

The only distinction between *George* and this case is the fact that there the commission paid to the third party was spurious, whereas here the Gallagher firm was entitled to the commission for having procured the insurance business. However, in both cases the person saddled with the responsibility for devoting loyal service to his employer concealed his secret profit from his employer and denied to that employer the right to know that the supplier of the product or service was willing to continue the supply at a discount to which the employer was entitled.

---

11. The mailings, both of checks by Cook County to the insurance companies and of checks by the insurance companies to the Gallagher firm, were "for the purpose of executing such a scheme or artifice. . . ." *See* United States v. Maze, 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974).

12. During the times involved in this case, which were all prior to the July 1, 1971 effective date of the new Illinois Constitution, Article X, Section 10 of the Constitution of 1870 provided that all fees or allowances received by county officers in excess of their

compensation should be paid into the County Treasury. Ill.Rev.Stat. ch. 53, § 49 provides that the County Clerk of Cook County shall be paid "as the only compensation for services rendered in the capacity of county clerk, or in any other capacity, the sum of $25,000 per annum." Ill.Rev.Stat. ch. 38 § 33–3 provides that "[a] public officer or employee commits misconduct when, in his official capacity, he commits any of the following acts: . . . [s]olicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law." The penalties include forfeiture of office, fine and imprisonment.

We conclude that the conviction of the defendant Barrett on the mail fraud counts was warranted by the evidence and the law. [13]

## V

Defendant's pre-trial motion to sever the mail fraud charges from the bribery and tax evasion charges under Rules 8(a) and 14, Fed.R.Crim.P.,[14] was denied.

The government's theory of joinder is that the bribery scheme and the insurance commission scheme were two transactions connected by Barrett's use of his public office for private gain.

In Finnegan v. United States, 204 F.2d 105 (8th Cir.), cert. denied, 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347 (1953), defendant was an I.R.S. employee charged with three counts of representing private clients and two counts of bribery. He was acquitted of bribery and one of the representation counts. The court held joinder of the five counts was proper under Rule 8(a) (204 F.2d at 109):

> All five of the offenses charged in this indictment were for violations of statutes designed to protect the government. The charge in each of the counts was the acceptance of money either for representing an interest adverse to the government or as a bribe to perform some act adverse to the interest of the government, the defendant being a trusted public official. All the offenses in effect charged a government official with taking the part of private interest in matters in which the government was a party.

All of the counts involved directly or indirectly, the use of official position for the benefit of private interest for a pecuniary consideration.

In Egan v. United States, 52 App.D.C. 384, 287 F. 958 (1923), defendant was a public official charged with representing a private party and with taking money to influence his official decisions. The court said the two crimes belonged to the same class.

In United States v. Weber, 437 F.2d 327 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971), defendant was a union official charged with Taft-Hartley and Hobbs Act violations. The court upheld the joinder under Rule 8(a) because the violations were connected by defendant's scheme to accept money from New Jersey contractors who employed members of his union.

In the Kerner case, Kerner asked for a severance under Rule 8(a) only of the perjury charge from all the other charges. The court held that the perjury and other charges were "all connected with, or arose out of, a common plan to corruptly influence the regulation of horse racing." United States v. Isaacs, 493 F.2d 1124, 1159 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

These cases support the government's position that here "[t]wo or more offenses may be charged in the same indictment . . . if the offenses charged . . . are . . . two or more acts or transactions connected together . . . ."

13. The instructions to the jury required a finding of specific intent to defraud as a prerequisite to a finding of guilt as to any and all of the mail fraud counts (Tr. 1621, 1646–47). In addition, the jury was instructed that good faith was a complete defense to the mail fraud counts (Tr. 1647). Finally, in regard to mail fraud, "[i]n determining whether the defendant acted in good faith or with intent to defraud with respect to these six offenses charged in these counts, you should consider all of the facts and circumstances relating to these alleged offenses." (Tr. 1647).

14. Fed.R.Crim.P. 8(a) states: *"Two or more offenses may be charged in the same indictment* or information in a separate count for each offense *if the offenses charged,* whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on *two or more acts or transactions connected together* or constituting parts of a common scheme or plan." (Emphasis added.)

■ A more difficult question arises under Rule 14,[15] which looks to the prejudice caused a defendant by a joinder of offenses. Obviously any adding of offenses to others is prejudicial to some extent. However, "[w]hether a severance of related offenses should be granted must remain largely within the discretion of the trial judge upon consideration of the circumstances of the individual case." American Bar Association Project on Standards For Criminal Justice, Standards Relating to Joinder and Severance, § 2.2(b) Commentary, p. 32 (1968).[16]

■ Reversal of a conviction on the ground of abuse of discretion for failure to sever an offense under Rule 14 is almost non-existent. Recently such a reversal occurred in this circuit in United States v. Pacente, 490 F.2d 661 (7th Cir. 1973), but on rehearing en banc the conviction was affirmed, 503 F.2d 543, 546 (7th Cir. 1974), where this court said:

The grant or denial of severance or separate trials under Rule 14 is discretionary. See, e. g., United States v. Kahn, 381 F.2d 824, 841 (7th Cir., 1967), cert. denied 389 U.S. 1015 [88 S.Ct. 591, 19 L.Ed.2d 661]; United States v. Quinn, 365 F.2d 256, 267 (7th Cir., 1966). Denial of relief will produce reversal only if abuse of discretion is shown. United States v. Rogers, 475 F.2d 821, 828 (7th Cir., 1973).

■ We cannot say that the district judge abused his discretion in this case.

## VI

Defendant raises several miscellaneous issues regarding pre-trial and post-trial motions, rulings upon evidence, and instructions.

■ Defendant filed and the district court denied a motion for a bill of particulars in regard to the six Travel Act-bribery charges, four of which charged travel in a specific month and two of which charged travel in a specified two-month period.

■ The motion for a bill of particulars is addressed to the sound discretion of the court. United States v. Kaplan, 470 F.2d 100, 103 (7th Cir. 1972), cert. denied, 410 U.S. 966, 93 S.Ct. 1443, 35 L.Ed.2d 701 (1973). "Of course, every denial of a defendant's request for a bill of particulars may in some measure make the preparation of his defense more onerous. But a demonstration of this generalized kind of prejudice is insufficient to override the broad discretionary power vested in a district court with respect to such requests." United States v. Wells, 387 F.2d 807, 808 (7th Cir. 1967), cert. denied, 390 U.S. 1017, 88 S.Ct. 1272, 20 L.Ed.2d 168 (1968).

The defendant seeks to demonstrate prejudice by reference to his motion for a new trial based on newly discovered evidence, which set forth the affidavit of Marijan Bojovic, a friend of defendant and his wife, who stated that she visited with the Barrets in Palm Springs, California, in February, 1969, and that Barrett was there from February 5 to February 16.

The indictment charged as to that count that Meyers had visited Barrett in Chicago "about February and March, 1969." Meyers testified at the trial that the visit occurred on February 13, 1969. Mr. and Mrs. E. B. Smith gave their affidavits that they had dinner with the Barretts and Ms. Bojovic in Palm Springs on February 14 and telephoned Barrett there on the evening of February 13. These facts did not rule out the

15. Fed.R.Crim.P. 14 provides in part: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

16. The A. B. A. Standards Commentary also states in regard to joinder: "The joinder together for one trial of two or more offenses of the same or similar character when the offenses are not part of a single scheme or plan has been subjected to severe criticism over the years. . . . Such joinder is allowed under Federal Rule 8. . . ." Section 2.2(a) Commentary, pp. 29–30.

possibility that Barrett was in Chicago to meet Meyers on February 13 but returned to Palm Springs that evening to receive the Smiths' telephone call and to play cards with Ms. Bojovic.

 The motion for a new trial on the basis of newly discovered evidence was properly denied because the "new evidence" was offered simply "to impeach the character or credit of a witness," defendant failed to show diligence in not discovering the evidence prior to or during the trial, and the defendant failed to meet the burden of showing "that the newly discovered evidence is so material that it *probably* would produce a different result if a new trial were granted." United States v. Curran, 465 F.2d 260, 264 (7th Cir. 1972).

This being so, and particularly since Ms. Bojovic further swore that she "visited Mr. and Mrs. Barrett in Palm Springs, California, every February from 1966 until 1970," it is very difficult to perceive how the defendant was prejudiced by being informed by the indictment that one of the Meyers' visits was "about February and March, 1969." As noted in United States v. Tanner, 279 F.Supp. 457, 476 (N.D.Ill.1967), aff'd in part and rev'd in part, 471 F.2d 128 (7th Cir.), cert. denied, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972), the government "need not furnish the exact date, since to do so would limit the Government to strict proof thereof at trial."

 The defendant complains of the exclusion of several exhibits, most of them relating to Meyers' income and cash availability, which were sought to be introduced to impeach him. Most of this material was cumulative of impeachment cross-examination of Meyers and often it went into areas which were clearly irrelevant. "The trial judge has wide discretion in the admission or exclusion of collateral evidence." United States v. Stone, 471 F.2d 170, 172 (7th Cir. 1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973). We find no reversible error in the exclusion of exhibits.

Defendant challenges government instructions 49, 50 and 51, regarding mail fraud. We find each of these instructions proper in view of our discussion of mail fraud in Part IV and particularly in view of United States v. George, 477 F.2d 508, 513 n. 6 (7th Cir.), cert denied, 414 U.S. 827, 94 S.Ct. 155, 38 L. Ed.2d 61 (1973).

 The defendant in a criminal case is entitled to have the jury consider a theory of defense which is supported by law and which has some foundation in the evidence. United States v. Bessesen, 445 F.2d 463, 467 (7th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 448, 30 L. Ed.2d 368 (1971). Defendant proffered a theory of mail fraud defense which contained several statements of theories which did not constitute legal defenses to mail fraud. The district court properly rejected it. Nor was there any error in the re-reading of the mail fraud instructions when the jury so requested.

Finally, the defendant contends that he was denied a fair and impartial trial by the prejudicial conduct of the court. We have read the record in this case. We found that while the perfect trial has yet to be tried, this trial was tried as well as any of those we affirm, by an experienced jurist who was careful to preserve the defendant's right to a fair trial.[17]

The conviction is affirmed.

Affirmed.

STEVENS, Circuit Judge (dissenting).

In order to determine whether the cumulative effect of the several errors in the proceedings below was sufficiently

---

17. A cautionary instruction was given to the jury as well: "If by any chance you feel that this court has intimated any opinion as to what I think the facts are, which I don't believe I have done, you are to disregard any intimation that you may have got from anything I said. I reiterate, you and you alone are the sole and the exclusive judges of the facts."

prejudicial to require a new trial, it is necessary to evaluate their effect in the context of the entire record. It is not our function to determine guilt or innocence, but, rather, notwithstanding our own persuasion on the question of guilt, to determine whether the jury's judgment may have been substantially swayed by error. Unless "when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect," it is our duty to order a new trial.[1]

This case proceeded to trial against a backdrop of extensive publicity given to allegations of corruption in local government. During the week in which the selection of the jury commenced, unprecedented publicity was given to the conviction of Judge Kerner. Because of its exceptional character, I think the trial judge should have granted a short continuance to allow the impact of the publicity to subside, particularly since there was no valid objection to such a delay. I do, however, accept the majority's conclusion that the denial of the motion for a continuance was a permissible exercise of the trial judge's discretion.

It is, nevertheless, perfectly clear that the publicity did not help the defendant's cause, and may well have tended to develop a "bandwagon" psychology that would make his conviction more likely. Indeed, a volunteered comment by the trial judge on the first day of the trial indicates that even he may have been influenced by widespread publicity about corruption in local government. During the direct examination of the witness Meyers, who was describing his rental of safe deposit boxes in which he kept funds to bribe public officials, the following occurred:

Q. Now, the box that you maintained with your name on it and your wife's name on it, was that ever changed in any way?

A. Yes, to a larger box.

Q. Now, do you recall the names—

The Court: *Was it as big as a shoebox?*

The Witness: Pardon me, sir?

The Court: Next question.

(R. 427) (emphasis added)

I think we may take judicial notice of the symbolic significance of a shoebox in view of the notoriety which followed discovery of former Secretary of State Paul Powell's cash hoard in such a container. That a federal district judge would make a gratuitous reference to a shoebox during the bribery trial of another public figure, who may well have been associated with Powell in the minds of some jurors, is, to say the least, distressing. His comment reminds us of how difficult it is to evaluate subtle effects of publicity in the trial of a prominent political figure. In view of that difficulty, I believe the possibility that the extensive publicity may have enhanced the likelihood of conviction is a factor we must weigh in evaluating the significance of trial error.

Another factor that compels close scrutiny of any error that may have influenced the jury is the extraordinary character of the government's arrangement with the witness Meyers. Judge Sprecher has demonstrated that Meyers' testimony was admissible. Nevertheless, since the government provided him with such a powerful financial incentive to testify that he paid large cash bribes to Barrett and to others—for every bribe described in his testimony, Meyers was to receive a tax benefit in like amount —there was certainly a strong possibility that the jury would find good reason to doubt Meyers' veracity. Since the prosecution's case rested largely on the

---

1. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557. In a passage which is too long to quote, but which is well worth rereading, Justice Rutledge carefully explained the distinction between the jury's function to determine guilt or innocence and the appellate judges' function, notwithstanding their own persuasion on the question of guilt, to determine whether the jury's judgment may have been significantly affected by error. *See id.*, at 763–765, 66 S.Ct. 1239.

credibility of this witness,[2] and since the credibility determination is exclusively within the province of the jury, this is a case in which appellate judges have a special responsibility to evaluate the significance of the rather plain errors which did occur. I shall identify those that trouble me the most.[3]

1. The joinder of two separate offenses was highly prejudicial to the defendant and, in my opinion, not authorized by Rule 8(a).

Unquestionably the jury's knowledge that for several years Barrett had been accepting secret insurance commissions on County business enhanced the likelihood that they would credit Meyers' testimony about secret cash bribes. Consider the impact of the prosecutor's argument:

"See, it wasn't enough for Edward Barrett to receive $180,000 in bribes. After he got the machines he got a little hungrier and he wanted some more money, and so he went ahead

and worked out an agreement where he could insure the machines, something he was required to do under the terms of his job, and then get a kickback in the form of a broker's commission." R. 1484

In its brief in this court the government argued that the insurance arrangement which originated as early as 1961, and the bribery in connection with the purchase of machines in 1967 and thereafter, were "parts of a common scheme or plan." The evidence affords no support at all for that contention and, quite properly, it is not accepted by the majority here. The two arrangements were made with entirely different sets of persons, at different times, and neither was in any way dependent upon the other. As the government states in its brief,

"other than with regard to background information, no one witness testified to events underlying both the bribery and the mail fraud offenses." [4]

2. The corroboration, though extremely persuasive, was not entirely unambiguous. Thus, the safe deposit box entries were sufficiently numerous that the entries shortly before Meyers' trips to Chicago were not unusual; the records of telephone calls to Barrett are innocuous since, admittedly, the negotiations relating to the purchase of voting machines were conducted by Meyers and Barrett; the airline records indicated that Meyers was in Chicago on the dates to which he testified, but, of course, told the jury nothing about what he did or whom he met; and the price increase attributed in his testimony to Barrett's demand for a bribe on Cook County sales was effective throughout the country and arguably justified by legitimate cost factors.

3. I should also express my agreement with the majority's conclusion that under the law of this circuit a violation of the mail fraud statute was proved, although I would rest that conclusion on the holding in United States v. Isaacs, 493 F.2d 1124, 1150 (7th Cir. 1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 rather than United States v. George, 477 F.2d 508 (7th Cir. 1973), cert. denied, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61, because I believe this record, unlike the record in George, forecloses the contention that the County, as a purchaser of insurance, may have suffered a pecuniary injury. Disclosure of the commercial bribery in the George case might have

enabled Zenith to buy supplies at a lower price; here, however, the uncontradicted evidence indicates that disclosure of the commission payments to Barrett would not have enabled the County to obtain insurance on any better terms.

4. Government's Brief at p. 43. The statement is made in support of the government's position, which I accept, that there was no significant risk that the joinder would tend to confuse the jury. The possibility of confusion, however, is not the source of prejudice which troubles me about this joinder. Rather, it is the vice of using evidence of one crime to prove the defendant's disposition to commit another. I think the government is correct in suggesting that Judge Hand's analysis in United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939), would lead to approval of this joinder. I believe, however, that prevailing opinion favors the views expressed long ago in Kidwell v. United States, 38 App.D.C. 566, at 570 (1912), as follows:

"It is doubtful whether separate and distinct felonies, involving different parties, not arising out of the same transaction or dependent upon the same proof, should ever be consolidated. But it should not be permitted where the crimes charged are of such a nature that the jury might regard one as corroborative of the other, when, in fact, no corroboration exists."

Thus, considerations of trial convenience do not support this joinder.

The theory on which the joinder is upheld is that the two crimes were "connected" because they both involved a breach of Barrett's public trust. No special significance is, or should be, attached to the fact that they both involved voting machines. In my judgment that "connection" is too tenuous to justify such a prejudicial joinder. Indeed, I believe the result is foreclosed by both branches of our decision on the severance issue in the *Quinn* case.[5] There the fact that the unlawful disbursement of funds on April 3, 1963, and again on July 8, 1963, both involved a breach of Quinn's fiduciary obligation to the depositors and shareholders of the Beverly Savings & Loan Association was insufficient to justify the joinder. Moreover, the similarity between the two transactions in the *Quinn* case, both of which involved the same institution, the same source of funds, and an appropriation of a large sum for the defendant's own benefit, was much more marked than the fact, present here, that two different illegal schemes both happened to relate to voting machines. Frankly, I have some doubt about the validity of the *Quinn* holding, but even if it were to be rejected, I would disapprove of this joinder. Certainly if *Quinn* is viable today, prejudicial error was committed in this case.

2. Documentary evidence which tended to support defendant's theory of the case was erroneously excluded.

A restatement of certain facts is necessary to explain the significance of the court's refusal to admit defendant's Exhibit 1–A, a letter to Shoup's customers announcing a 4% increase in the price of voting machines effective July 1, 1966. That letter listed prices, F.O.B. factory, for eight different models of voting machines, including a "50 Bank/Manual" at $1,862.00. The machines used in Cook County were of that kind, but instead of using the standard 10-column model, Cook County used a modified machine with only six columns. Meyers testified that he told Barrett that that fact would justify a higher price in Cook County than elsewhere.[6] If the modification were ignored, defense counsel argued that the cost of transporting machines from the factory to Chicago would produce a delivered price of about $1,890.00 for the 50 Bank/Manual model. The defense took the position, quite properly, that these facts were relevant to an evaluation of the credibility of Meyers' testimony concerning the reason for a price increase in Cook County.

Meyers testified that Barrett's demand for a bribe of $200 per machine made it necessary for Shoup to increase its price on sales to Cook County. This was, of course, an especially dramatic element of the government's proof. The testimony indicated that the bribe demand was made in December of 1965, a few months after Shoup had offered to sell Cook County machines at a $1,791.00 price. Ultimately, in October, 1967, the parties agreed on a price of $1,890.00.

It was the government's theory that this price increase between 1965 and 1967 was attributable to Barrett's demand for a bribe. It was the defendant's theory that the increase was attributable to "higher costs of steel and other manufacturing expenses"—the factors referred to in the 1966 price increase letter—factors which had an impact on prices throughout the country.

---

5. United States v. Quinn, 365 F.2d 256, 263–267 (7 Cir. 1966). The court held both (1) that the joinder was improper and (2) assuming no misjoinder, that the potential for prejudice required a severance.

6. This statement is based on Meyers' direct testimony. (R. 406–407) I recognize that he testified on redirect examination that the cost to manufacture Cook County machines was actually less than the cost of Shoup's standard 10-column model, and that converting a standard 10-column manual machine to a 6-column machine enabled Shoup to use four columns of parts in the production of their machines. (R. 918–919). Such testimony relates to the weight the jury might properly give to the price increase letter but, in my judgment, clearly does not affect its admissibility.

Whether or not the letter expressly related to sales to Cook County, it unquestionably tended to support defendant's version of the facts.

The colloquy relating to the admissibility of this exhibit is remarkable. Out of the presence of the jury, before the prosecution rested its case, government counsel advised the court that the defendant intended to offer certain documents in evidence before putting on any witnesses, and that although authenticity had been stipulated, the government had reserved the right to object to relevancy.[7] The court then asked defense counsel to "go down the list" to avoid unnecessary interruption of the proceedings before the jury. Defense counsel then started to describe Exhibit 1–A and, without any objection being made by the government, a long colloquy between the court and defense counsel ensued.

During the first portion of that colloquy the court's comments suggest that he considered the letter immaterial because it did not prove any wrongdoing by Meyers;[8] later the court seemed to suggest that the document was inadmissible because Meyers had acknowledged that it was genuine and had given testimony on cross-examination which was consistent with the contents of the letter;[9] finally, the prosecutor joined the discussion and suggested that the letter was irrelevant because there was no evidence that it was sent to Cook County,[10] and, further, because Cook County did not use the standard 50 Bank machine referred to in the letter.[11] The court then observed that the letter made no reference to the six-column 50 Bank machine which was used only in Cook County, and ultimately decided to exclude it.

If the court's ruling was based on the ground that the exhibit was cumulative —as the government argues on appeal —it was plainly erroneous. Unquestionably a document of this character, which can be reviewed at leisure during jury deliberations, may have a much greater impact on the jury than mere recollection of precisely what a witness may have admitted in the course of a lengthy cross-examination. The suggestion that the document was irrelevant is so manifestly frivolous that, to its credit, the government no longer places any reliance on that argument. The exhibit should have been received in evidence;

7. R. 1122–1124.

8. The Court: Does an automobile salesman commit a crime because he doesn't charge the suggested factory price of an automobile?
 Mr. Foran: I am not saying that Meyers commits a crime at all, your Honor, but I am saying that—
 The Court: I mean, prices are pretty flexible. If you want to sell machines real bad, you can shave a little bit. (R. 1129)

9. The Court: You have got all that in verbatim from his lips. He has—
 Mr. Foran: Your Honor—
 The Court: He has acknowledged sending this out. He has explained it on your cross examination. Nobody has tried to shake him from what he said. Nobody has made a motion to strike what he said. It's in the record. I don't know why you need a piece of paper in there.
 Mr. Foran: Because, your Honor, it's in his own handwriting.
 The Court: He has already acknowledged that.
 Mr. Foran: Well, your Honor, just as a matter of argument, I can show them that for once the only way that I could make the man tell the truth was when I could show him something in his own handwriting.
 Your Honor, that's an essential piece of evidence. It—
 The Court: I mean, if I followed your logic, Mr. Foran, the government would have to bring in sixty-five calendars that Friday, the 28th—or that the 28th of August was on a Friday, because one calendar isn't enough.
 You have got this in the record from his lips, and it's uncontradicted and it's undenied, and I don't know why you need a piece of paper since he has acknowledged, in the presence of the jury, what that thing says.
 Mr. Foran: And so therefore I should be able to show it to the jury, show them what he acknowledged, your Honor.
 (R. 1131–32)

10. R. 1132–33.

11. R. 1135.

unquestionably its rejection was prejudicial to the defense.

In my judgment, two other categories of exhibits should also have been received.

For its corroboration of the bribery testimony, the government relied, in part, on records of entries to safe deposit boxes to which Lemisch and Hirshorn had access. According to the government's evidence, only two such boxes were used to hoard the cash which was paid to Barrett, and its documentary proof was limited to those two boxes. The defendant offered five records proving that there were additional safe deposit boxes which Hirshorn and Lemisch opened on many occasions. Proof that there were such numerous entries would, of course, have minimized the significance of any particular entry close in point of time to one of Meyers' trips to Chicago. The defense exhibits were, therefore, relevant and admissible.[12]

The defendant contended that Meyers accumulated his huge cash hoard, on which he paid no income taxes, to finance his own extravagant personal expenses. In support of this contention, defendant offered numerous exhibits tending to prove high expenditures for gambling, travel, rent, the purchase of securities, and other personal items. Although some of these exhibits were received, it seems to me that it was error to exclude those which disclosed Meyers' rent and apartment expenses and his bank statements and income tax returns.

3. The trial judge made prejudicial and inaccurate comment on the testimony.

In support of his theory that Meyers used cash hoards for personal expenses rather than bribes, defendant attempted to establish that Meyers habitually carried large sums of cash on his person. On cross-examination, Meyers was asked about conversations with a policeman who had been called after a burglary of Meyers' apartment. He was unable to recall telling the policeman that he had won $1,600 at the races earlier that day (R. 838-839) or that his wife had told the officer that he carried large sums of money on his person. Without any objection having been raised by the prosecutor, a colloquy then ensued in which, it is fair to say, the trial judge belittled defense counsel, and the witness categorically denied having had "a bad habit of carrying large sums of money on [his] person."[13]

12. I am not by any means suggesting that they disprove the government's theory of the evidence; I merely make the point that they should have been included in the record for the jury to evaluate.

13. Q. And in that same conversation, your wife also informed the officer that the victim had a bad habit of carrying large sums of money on his person, and was quite careless about showing it, didn't she?
A. I don't recall my wife ever saying that.
Q. Did she say to them in your presence—
The Court: Are you going to call his wife to impeach him with that statement?
Mr. Foran: No, your Honor, but I certainly can call the policeman whom she made the statement to, in his presence.
The Court: You can't impeach his wife on the basis of what his wife said to a policeman.
Mr. Foran: I am not trying to impeach his wife.
The Court: You can't impeach him on the basis of what his wife said to a policeman.

By Mr. Foran:
Q. Well, is it true, Mr.—
A. I don't recall the statement.
The Court: He is about to ask you a question. Let's see what happens now, after he says, "Is it true. . . ."
By Mr. Foran:
Q. Is it true, Mr. Meyers, that you do have a bad habit of carrying large sums of money on your person, and that you are quite careless in showing it?
A. No, sir.
Q. That every time you leave a restaurant, you stand outside and pull out your bankroll and count it in plain view of somebody passing by?
A. Is that a—
The Court: Are you going to have a passer-by to impeach him?
The Witness: Is that a serious question?
Mr. Foran: What I'm saying, your Honor, is that this man was present after—he has testified here that he did not keep a lot of cash on hand.
The Court: That's right.

Later in the trial, the defense produced the police officer; he testified that both Meyers and his wife had, in fact, made the statements that Meyers had been unable to recall. In each instance, without any objection from the government, the trial judge volunteered a comment incorrectly indicating that the officer was corroborating, rather than contradicting, the substance of what Meyers had said:

Q. Mr. Witness, did Mr. Meyers tell you at that time, during that conversation, that he had been to the racetrack the day before and hit the big exacto for around $1600?

A. He did.

The Court: There is no impeachment there.

Mr. Foran: Exactly the opposite, your Honor, Mr. Meyers had denied that he had told the police that.

The Court: This is cross examination. He is not impeaching Mr. Meyers' statement. He said he told them that. (R. 1204-05)

And a few minutes later:

Q. Mr. Witness, did Mrs. Meyers tell you at that time that Mr. Meyers had a bad habit of carrying large sums of money on his person and was quite careless about showing it?

A. Yes, she did.

Mr. Foran: He has testified that he did not carry large bills around with him.

The Court: That's right.

Mr. Foran: And now—

The Court: Now are we going to have some witnesses that say that he stands in front of restaurants and waves his bills in the air to all the passers-by?

Mr. Foran: I asked him whether he was present at a conversation where his wife told the policeman that in the course of this burglary. He said he was not, and I am asking—

The Court: That doesn't impeach him, whatever his wife said to a policeman. The objection is sustained.
(R. 842-844)
[The "objection" which the court sustained does not appear in the record.]

The Court: Now you have corroborated Mr. Meyers. That is what he said to you.

Mr. Foran: Your Honor, he denied that very thing.

Your Honor, I have a motion, your Honor, and I would like to make it out of the presence of the jury.

The Court: Hold your motion. We have had enough motions, until ten minutes to 4:00. We will rule on it after the jury leaves. We are not going to run a swinging door courtroom this afternoon.

What is the next question?

(R. 1209) [14]

The comments by the trial judge are *significant not merely because they were inaccurate, but more importantly because they must have given the jury the impression that the judge fully credited the testimony of the government's key witness.* I do not believe the impact of such an incident can be completely cured by a subsequent instruction "to disregard any intimation that you may have got from anything I said."

Defendant has called our attention to other comments by the trial judge that may have implied approval of Meyers' testimony. Those comments are consistent with defendant's interpretation, but, as they appear in a cold transcript on

14. What happened after the jury was excused is not apparent from the transcript before us. However, the substance of the court's action is apparent from his comment at the commencement of the next session:
The Clerk: Case on trial.
The Court: Are there any Monday motions?
The Monday motion for a mistrial is denied.
Mr. Casey: Your Honor, in reviewing the transcript from Friday, although Defendant's Exhibit—
The Court: One newspaper says I overruled it and one newspaper said I didn't. If I have done it already, I will do it a second time, and if I haven't done it, I will do it the first time, on the motion for a mistrial.
Mr. Casey: O.K., Judge.
The Court: So at least it is done at least once and maybe twice. (R. 1244)

appeal, I am unwilling to characterize them as prejudicial.[15]

4. The trial judge also made certain comments outside the presence of the jury that revealed a judgment, formed before all the evidence had been heard, that the defendant was definitely guilty.

For example, during a colloquy in which the subject of renting a larger safe deposit box was under discussion, the following exchange occurred:

> The Court: And when did they open the joint box?

> Mr. Foran: Not until 1967, your Honor.

> The Court: Well, they didn't need to open one because they hadn't met Mr. Barrett yet. Maybe the boxes that they had were sufficient, but when they met him they needed bigger boxes. (R. 1146)

The comment was not heard by the jury and I am sure it did not intimidate the defendant's experienced trial counsel. Nevertheless, it was a highly improper remark for the presiding judge to make and may well have had an impact on the defendant himself when, presumably, he may have been considering whether or not to take the witness stand. He did not testify. Notwithstanding the cautionary instruction to the jury about drawing no adverse inference from his failure to do so, the fact that an important public official did not personally deny the serious charges which Meyers had made almost certainly had an influence on the jury's deliberations. It is less clear that the decision of this 73-year old defendant was influenced at all by the trial judge's hostile comment. Instead of speculating about the actual impact of the comment, however, I consider it so manifestly improper that I would presume that it was prejudicial. Certainly it makes me wonder if it is appropriate to construe other ambiguous comments made in the presence of the jury as having been harmless.

As I reflect on the record in this case, I must confess to some doubt as to whether the errors warrant a new trial. For the evidence of guilt is indeed strong, and the crimes of which Barrett has been convicted involve the shabbiest kind of breach of trust. It is, therefore, unusually tempting to acquiesce in a decision which may well represent the just and inevitable conclusion of this matter in all events. The temptation is particularly strong when I note the professional manner in which the prosecutor tried the case.[16] Nevertheless, because more enduring values are challenged whenever there is reason to doubt that a notorious public trial has been conducted in an evenhanded manner, I feel obligated to resolve my doubts in favor of a position which would minimize the danger that fair and regular procedures may be compromised in the future.

15. For example, during the attempt to establish Meyers' excessive expenditures, he was asked what stock he owned. Without an objection having been interposed, the trial judge interjected:

"Well, now, this is not the Governor requiring somebody to make a net worth statement if he works for the State of Illinois. He is not required to disclose to you what stocks he owns now." (R. 788)

16. This should not be construed as approval of the prosecutor's position on the Bill of Particulars question. I think the government should have been required to provide the defendant with a more definite statement of the dates on which Meyers traveled to Chicago to deliver bribe money to Barrett. The specific dates were established by airline records, and I see no reason why this information should not have been made available to the defense in advance of trial. A rule which would have denied the government the right to introduce evidence as to dates not specified would have done no harm in this case, since there was no uncertainty as to its theory of the evidence. If there had been doubt as to the dates of the meetings between Meyers and Barrett, an appropriate caveat in the government's response to the order would have preserved its ability to place proper evidence before the jury.

Perhaps, as the government argues, defendant cannot demonstrate specific prejudice, but certainly the refusal to provide precise information which was readily available made the preparation of the defense more difficult.

This case brings to mind the trial of Titus Oates, a guilty man who was convicted by improper methods. Macaulay's observation about that trial is worth repeating:

"That Oates was a bad man is not a sufficient excuse; for the guilty are almost always the first to suffer those hardships which are afterwards used as precedents against the innocent." [17]

I respectfully dissent.