Henry J. BRUBAKER and Civilla J. Bru-
baker, Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 14647.

United States Court of Appeals
Seventh Circuit.

Feb. 26, 1965.

Rehearing Denied March 26, 1965.

Harold F. Ronin, Chicago, Ill., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Joseph M. Howard, U. S. Dept. of Justice, Washington, D. C., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Lee A. Jackson, Melva M. Graney, Thomas L. Stapleton, Dept. of Justice, Washington, D C. (Edward V. Hanrahan, U. S. Atty., Thomas J. Curoe, Asst. U. S. Atty., of counsel), for appellee.

Before DUFFY and CASTLE, Circuit Judges, and GRANT, District Judge.

GRANT, District Judge.

This appeal is from the District Court's judgment in a suit for refund of excess profits tax in the amount of $25,312.09, and interest in the amount of $20,572.73 on that tax paid by the taxpayer to the Collector of Internal Revenue on or about March 25, 1957. The excess profits tax in question had been assessed in 1952 against the Des Plaines Oil Company, the assets of which taxpayer was the transferee, for the period from May 12, 1944, to April 30, 1945. The taxpayer bases his claim for refund on the contention that a 1955 compromise agreement purporting to settle certain renegotiation matters entered into between the United States and a group of individuals represented by attorney Harold F. Ronin included the presently contested excess profits tax liability of this taxpayer. The District Court entered judgment for the United States, rejecting taxpayer's contention and holding that the renegotiation matters were and are distinguishable from the excess profits tax assessment, and that the latter was not specifically referred to and thus not included in the 1955 settlement contract.[1]

---

1. The text of the settlement agreement reads as follows:

**AGREEMENT**

Agreement made and entered into this 29th day of December, 1955, between the United States of America, acting through its United States Attorney at Chicago, Illinois, hereinafter referred to as the party of the first part, and Kenneth F. Nash, H. P. Brubaker, E. A. Gilchrist, Frederick A. Nash, R. F. McCartin, J. H. Lahman, E. H. Pester, G. E. Brubaker, C. B. Brubaker, Lela L. Arnould, and W. C. Lahman, formerly partners, doing business as Joliet Chemicals, Ltd., a limited partnership; Joliet Chemicals, Inc., a corporation; Joliet Industrials, Inc., a corporation; and Des Plaines Oil Company, a corporation, all hereinafter jointly referred to as the parties of the second part.

Whereas, the War Contracts Price Adjustment Board determined that Joilet Chemicals, Ltd., a limited partnership, composed of Kenneth F. Nash, R. J. Brubaker, E. A. Gilchrist, Frederick A. Nash, W. E. McCartin, J. H. Lahman, Floyd D. Higby, Sr., R. N. Pester, C. A. Brubaker, C. B. Brubaker, Lela L. Arnould, Robert L. Foltz, and W. C. Lahman, and Joliet Chemicals, Inc., successor, had realized excessive profits during the fiscal year ended January 31, 1946; and

Whereas, the War Contracts Price Adjustment Board determined that Joliet Industrials, Inc., a corporation, had realized excessive profits during its fiscal year ended April 30, 1946; and

Whereas, the War Contracts Price Adjustment Board determined that Des Plaines Oil Company had realized excessive profits during its fiscal year ended April 30, 1945; and

Whereas, the indebtedness due the party of the first part as a result of the determinations of the War Contracts Price Adjustment Board has not been paid; and

Whereas, the party of the first part has instituted actions against none or all of the parties of the second part in an effort to liquidate the indebtedness referred to above; and

The facts of this case are complicated, but not disputed. They were the subject of a stipulation between the parties in the District Court, which stipulation was adopted in toto in that Court's findings of fact. Briefly, they may be stated as follows:

■ The taxpayer, Henry Brubaker,[2] became a principal stockholder during World War II in an Illinois Corporation

Whereas, by letter dated March 29, 1954, as amended, the parties of the second part offered to compromise the claim of the party of the first part by, among other actions, the payment of a certain sum of money; and

Whereas, one of the terms of the said offer read as follows:

4. *Payments totalling approximately $8,000.00 made by former limited parters, Lloyd (sic) Higby, Sr. and Robert E. Foltz, shall also be applied as partial payments in conjunction with this offer.* (These payments were made by the aforenamed partners after demand upon them by the U. S. Attorney for payment of their pro rata share of the order of the WCPAB).

and

Whereas, upon examination it has been ascertained that said payments in the amount of $8,000 were not in fact made as stated in said paragraph 4; and

Whereas, the parties of the second part wish the party of the first part to process the offer as submitted; and

Whereas, the party of the first part is willing to accept a deposit in escrow of $8,000 in lieu of the amount of $8,000 referred to in paragraph 4 above,

Now, Therefore, it is agreed as follows:

(1) Upon execution hereof, there shall be deposited with the Chicago Title and Trust Co. of Chicago, Illinois, hereinafter referred to as the escrow agent, cash in the amount of $8,000.

(2) It is understood that the party of the first part will seek to obtain judgment against the said Robert E. Foltz and Floyd Higby, Sr., for the sum of their indebtedness to the party of the first part as indicated above.

(3) If a sum of $8,000 shall not be paid to the party of the first part by Floyd Higby, Sr. and Robert E. Foltz, either as a result of judgment obtained against them individually and/or collectively as a result of their indebtedness to the party of the first part as indicated above, or if a judgment is not obtained by the party of the first part against the said Floyd Higby, Sr. and Robert E. (sic) Foltz and after a demand by the party of the first part against the said Floyd Higby, Sr. and Robert R. (sic) Foltz to pay to the party of the first part the sum of $8,000,

then 60 days after demand by the party of the first part to the escrow agent the escrow agent shall pay to the party of the first part such part or the whole of said $5,000 as may be necessary to make up the balance of the $8,000 remaining as not having been paid by the said Floyd Higby, Sr. and/or Robert E. Foltz.

(4) It is understood that the parties of the second part will pay to the escrow agent any costs or expenses accruing or arising as a result of this agreement.

(5) The balance remaining of said $8,000 after payment of the party of the first part's claim shall upon certification by the party of the first part be returned to the parties of the second part.

In Witness Whereof the parties have caused these presents to be executed on the date above written.

United States of America
By /s/ R. Tieken
 United States Attorney
 Party of the First Part

Kenneth F. Nash, H. J. Brubaker, E. A. Gilchrist, Frederick A. Nash, W. B. McCartin, J. H. Lahman, E. H. Pester, C. R. Brubaker, C. J. Brubaker, Lela L. Arnould, and W. C. Lahman, formerly partners, doing business as Joliet Chemicals, Ltd., a limited partnership; Joliet Chemicals, Inc., a corporation; Joliet Industrials, Inc., a corporation; and Des Plaines Oil Company, a corporation.

By /s/ Harold F. Ronin
By /s/ J. C. Ryan
 Parties of the Second Part

2. Although Civilla J. Brubaker sued as plaintiff in this action and apparently filed with Henry J. Brubaker a joint return of their income for 1945, the transferee liability for the excess profits tax of the Des Plaines Oil Company was assessed only against Henry and satisfied (with the interest) by him. No right, or interest, of Civilla in the recovery of that tax appears, and she would not be entitled to a judgment against the Government in any event. See McMahon v. United States, D.C., 172 F.Supp. 490 (R.I.1959); Internal Revenue Code of 1954, Section 7422(a). Henceforth, "taxpayer" will be used in the singular to refer to Henry J. Brubaker.

called Des Plaines Oil Company. This company, which had been one of several business entities utilizing substantially the same personnel and facilities formed for the purpose of selling silica gel to the military, became inactive after the war and its assets were transferred to several individuals and former stockholders, one of whom was the taxpayer.

In November, 1951, the Commissioner of Internal Revenue assessed certain tax deficiencies against this corporation for the period May 12, 1944, to April 30, 1945. These deficiencies included $65,168.83 in excess profits taxes for the period and $24,944.40 in interest thereon. The reason for this deficiency assessment was the disallowance by the Commissioner of certain deductions claimed by the company in computing its income for that period. These deductions were $40,767.30 characterized as "royalties" by the company but found to have been distributions of earnings to the several stockholders and $53,192.30 characterized as "commissions" but found to have been a means of draining off company profit for the exclusive benefit of five members of the joint venture, one of whom was the taxpayer.

In March, 1952, the Commissioner proceeded to make an assessment against each of the transferees of the Des Plaines assets limited in each case to the value of assets each had received. The assessment against the taxpayer as a transferee of the assets for the deficiency in excess profits taxes was $25,312.09 with $10,178.93 in additional interest. Subsequently, on February 19, 1957, and March 26, 1957, the taxpayer paid this assessment with accrued interest in the sum total of $45,884.82. After disallowance by the Commissioner of taxpayer's

claim for complete refund of this payment, taxpayer instituted the present suit.

Coincident with much of the above-described activity involving the Internal Revenue Service, taxpayer—also by virtue of his business capacity in the various concerns producing silica gel— was involved in certain renegotiation proceedings conducted by the War Contracts Price Adjustment Board (WCPAB). The Board, acting under the authority of the Renegotiation Act of 1943 [3] to recover overcharges on war-time contracts with the military, demanded payment in the following amounts from the following business entities, as reduced by statutory tax credits: [4]

Joliet Chemicals, Inc., successor of the partnership, Joliet Chemicals, Ltd., for the fiscal year ending January 31, 1946 [5]—$89,484.98.

Joliet Industrials, Inc., for the fiscal year ending April 30, 1946— $90,032.74.

Des Plaines Oil Company, for the fiscal year ending April 30, 1945— $63,229.19.

The basis for the Board's determination against the Des Plaines Oil Company was a finding that certain items designated by the company as contract expenses were in effect additional profits and overcharges not contemplated by the contracts. The Board found that $40,767.30 designated as "royalties" were not royalties but additional payments to stockholders, and that $35,986.00, in a category called "commissions", were not legitimate contract expenses.[6]

On October 27, 1948, certain stockholders and partners in these firms filed petitions in the Tax Court under Section 403

---

3. Renegotiation Act, c. 247, 56 Stat. 226, 245, Sec. 403, as amended by Sec. 701 (b), Revenue Act of 1943, c. 63, 58 Stat. 21, 78.

4. Under Section 3806 of the Internal Revenue Code of 1939.

5. Demand was made for repayment by the taxpayer as a general partner for his share of the excessive profits in the

amount of $26,790.00, less the tax credit of $11,824.04, or a balance of $14,965.96.

6. These "royalties" and "commissions" were also disallowed by the Commissioner of Internal Revenue in computing the excess profits tax due under the Internal Revenue law. The Commissioner, however, disallowed "commissions" totalling $53,192.30 and "royalties" of $40,767.30, as already indicated.

(e) of the Renegotiation Act for a redetermination of the fact and amounts of overcharges of Joliet Chemicals, Ltd. (three petitions were filed, the taxpayer's name appearing on one), and of Joliet Industrials, Inc. (one petition). The Des Plaines overcharges were not disputed by anyone and no petition for redetermination disputing the fact or amount of the Des Plaines overcharges was filed by any party. While these petitions were pending, on November 14, 1950, the United States commenced proceedings in the United States District Court for the Northern District of Illinois to enforce the findings of the WCPAB.

Negotiations were then conducted between attorney Harold F. Ronin, acting in behalf of the aforementioned business entities and the several stockholders, including the taxpayer, and the Department of Justice. For purposes of this cause, it appears that the negotiations commenced with Mr. Ronin's offer, made on behalf of his clients, of November 17, 1950, contained in his letter of that date. The negotiations were concluded upon the Department of Justice's acceptance of an amended offer, submitted by Mr. Ronin in the interim, the same effected by the Department's letter of October 17, 1955. It is the fruit of these negotiations—the contract of settlement or release arising out of the aforementioned offer and acceptance—that is at issue in this cause. Specifically, the sole issue for our consideration is whether the contract of October 17, 1955, admittedly a settlement of the renegotiation liability of the various parties, was also intended to, and in fact did, settle the taxpayer's excess profits tax liability. We feel that it did not, and that the District Court was correct in entering judgment for the defendant-appellee, United States.

The only evidence of the terms of the settlement contract is the correspondence between the parties. While the "Stipulation of Facts", agreed to by both sides and submitted in the District Court proceeding, makes mention of at least eleven separate letters exchanged by the parties, and while all have been evaluated by the Court, disposition of this issue can be effected by a specific reference to six of this number.

Mr. Ronin's letter of November 17, 1950, addressed to the Assistant U. S. Attorney in Chicago, states:

"I have been authorized to submit a firm offer of $5,000.00 in full settlement of *all renegotiation claims* against Joliet Chemicals, Inc., Joliet Industrials, Inc., Des Plaines Oil Co., Joliet Chemicals, Ltd. and all of the individual partners." (Emphasis supplied.)

The letter also states that three of Mr. Ronin's clients, including the taxpayer, have "agreed to raise that amount to dispose of all of the various renegotiation claims." Without doubt, this, the original, offer was intended to relate to the renegotiation claims exclusively of all others the taxpayer may have been subject to at the time.

The March 29, 1954, letter of Mr. Ronin to the Assistant U. S. Attorney in Chicago is relied on heavily by the taxpayer. With reference to the offer of compromise submitted by Mr. Ronin, the letter states that "All claims of the contractors against the Government * * would be released * * *" In another place is found: "The sum of Five Thousand Dollars ($5,000.00) in cash would be paid * * * in full satisfaction of all claims against the individual partners of Joliet Chemicals, Ltd." It is this language, taxpayer contends, that materially altered the original offer of November 17, 1950, to extend the subject matter of the proposed settlement to include taxpayer's excess profits tax liability. In support of its contention, taxpayer points out that the reference heading on the letter was as follows:

"Re: Des Plaines Oil Co.
 Joliet Chemicals, Ltd.
 Joliet Chemicals, Inc.
 Joliet Industrials, Inc."

Inasmuch as there was no renegotiation dispute involving Des Plaines Oil Com-

pany, the reference heading to that entity had to refer to the claim against it for excess profits taxes, argues the taxpayer. However, this, plus one other questionable reference to the excess profits tax dispute cannot overcome the fact that nowhere in the letter is that dispute mentioned explicitly. Furthermore, it is quite clear that the Government did not understand the March 29, 1954, offer as distinct from the original offer of November 17, 1950. The letter sent to Mr. Ronin in reply to his letter of March 29th, dated July 26, 1954, contained the reference heading

> "Re: Des Plaines Oil Co.
> Renegotiation Liability—
> 1945
> Joliet Chemicals, Ltd.
> Renegotiation Liability—
> 1946
> Joliet Industrials, Inc.
> Renegotiation Liability—
> 1946"

and noted that

> "While you refer to the Des Plaines Oil case in the caption of your letter (of March 29, 1954), no reference is made to any action pertaining to that case in your letter."

There can be no question that the Department of Justice understood and construed the letter of March 29th to in no way broaden the base of the proffered settlement to encompass the taxpayer's dispute with the Commissioner of Internal Revenue.

In retrospect, we can say that this point in the settlement negotiations was crucial to taxpayer's contentions here. The Government's letter of July 26, 1954, raised important questions as to Des Plaines Oil Company, both as to its financial condition and its place in the proposed settlement. Much depended upon

Mr. Ronin's reply to the Government's request for information.

Mr. Ronin's reply was forthcoming in his letter to the Department of Justice dated October 22, 1954. Unlike the letter of March 29, 1954, he noted explicitly that it was his "desire to amend the proposal." Three amendments were proposed in that letter, the last of which is determinative of the issues raised in this appeal:

> Paragraph 6. Add this paragraph.
> "All of the foregoing will be done in consideration of the release and *in full satisfaction of all renegotiation claims* against Des Plaines Oil Co., Joliet Chemicals, Inc., Joliet Industrials, Inc. and the individual partners of Joliet Chemicals, Ltd." (Emphasis supplied.)

Thus, the inquiries of the Department of Justice as to Des Plaines Oil Company were resolved to the effect that its liability *in the renegotiation matter* was to be included in the subject matter of the settlement, notwithstanding the fact that this liability had not been disputed by the taxpayer or anyone else by the filing of a petition for redetermination of the fact and amount of the overcharges in the Tax Court.

Inclusion of the renegotiation liability of Des Plaines in the offer of settlement was apparently proposed to make the package complete, for the reason that, inasmuch as there was no Des Plaines proceeding pending in the Tax Court, it could not have been done "to avoid the continuing expense of litigation."[7] That this "concession" was made by the Department of Justice, *and no more,* is evidenced by the language of its acceptance of the offer of settlement. The acceptance was made in a letter from the Department of Justice to Mr. Ronin, dat-

---

7. Mr. Ronin, in his letter to the Department of Justice dated March 29, 1954, prefaced the recital of the terms of the proposed settlement by saying:
> In a sincere effort to dispose of the various items of dispute and to avoid

the continuing expense of litigation, the contractors have authorized us to submit the following offer of compromise. * * *

ed October 17, 1955, which contained the following reference heading:

Re: Joliet Chemicals, Ltd.
 Renegotiation Liability—
 1946
 Joliet Industrials, Inc.
 Renegotiation Liability—
 1946
 Des Plaines Oil Company
 Renegotiation Liability—
 1945
 Joliet Chemicals, Ltd. v. U.S.
 Tax Court Docket Nos. 818–
 R, 819–R
 Joliet Chemicals, Inc. v. U.S.
 Tax Court Docket No. 820–R
 Joliet Industrials, Inc. v. U.S.
 Tax Court Docket No. 821–R

The acceptance of the offer of settlement is found in the first paragraph:

"Please be advised that the Attorney General has accepted the offer in compromise pertaining to the above referenced proceedings, as submitted by you in your letter dated March 29, 1954, as amended by your letter of October 22, 1954, conditioned upon the execution of the escrow agreement submitted to you by our letter dated September 30, 1955, and the deposit of funds pursuant thereto."

Thus we have an offer and acceptance as well as a series of correspondence wherein this taxpayer's excess profits tax is never explicitly mentioned and the supposed allusions thereto are specious at best.[8] The offer of March 29, 1954, which conceivably could have contained some ambiguity, was subsequently amended by Mr. Ronin to erase all doubt by the insertion of the phrase "in full

satisfaction of all *renegotiation* claims." (Emphasis supplied.) Finally, the Government, by its reference to the renegotiation claims (as it had in all its correspondence) and incorporating the same in the terms of its acceptance, adhered to the only reasonable interpretation of the amended offer, an interpretation not thereafter challenged or controverted by the taxpayer until the filing of this suit.

 The well-established principles of construction as applied to agreements such as the one at issue are clearly stated in 6 Corbin on Contracts (1962), Section 1277, pp. 117–122, as follows:

The process of making an accord, of interpreting the words and acts of the parties, and of determining the legal effect thereof, is the same as in the case of other contracts. In order that a performance rendered by an obligor shall operate as a satisfaction of the claim against him, it must be offered as such to the creditor. There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise. If it is not so rendered, there is no accord, for the reason that there are no operative expressions of agreement— no sufficient offer and acceptance.

\* \* \* \* \* \*

So, where there are two or more claims, the payment of the amount of one of them may reasonably be taken by the creditor as intended to settle the one claim alone; it will not operate as a satisfaction of both

---

8. There is only one further bit of language in all the correspondence which is helpful to taxpayer's position. Such is found in a letter to Mr. Ronin, dated September 14, 1955, from the Department of Justice wherein it is stated that "You (Mr. Ronin) will recall that there is an offer pending which, if accepted, would dispose of these (renegotiation) cases as part of the compromise without further litigation in the Tax Court \* \* \*" The words "as part of the

compromise" relied upon by the taxpayer, however, receive their most plausible interpretation from the fact that, by Mr. Ronin's own offer of settlement, dismissal of the renegotiation cases itself constituted only part of the proposed agreement. In addition to the dismissals, there were also provisions for the payment of $8,000.00 into escrow, $5,000.00 in cash, and release of a $20,000.00 refund due on the claim of Joliet Chemicals, Inc.

claims unless the debtor, when paying, clearly expresses to the claimant an intention that it shall so operate.

■ Furthermore, it is also well-settled that the burden of establishing a release is on the party relying on it and such party has the burden of showing the applicability of the release to the controversy forming the subject matter of the action. 76 C.J.S. Release § 65, p. 705; see also, Sanders v. Commissioner, 225 F.2d 629 (10th Cir. 1955); Kerr v. Schrempp, 325 Ill.App. 614, 60 N.E.2d 636 (1945). The District Court correctly concluded that, as a contract, the parties themselves had the complete and exclusive right to determine its terms, and, as such, could either have included or excluded the excess profits tax assessment against the taxpayer. Inasmuch as that liability was not expressly included, it is incumbent upon the party alleging its inclusion to show that such was the mutual intent of the parties or the proper interpretation of the language of the agreement as written.

Principles of law converse to the foregoing have been briefed and argued by the taxpayer. However, the argument that, as to a general release, the burden is on the party seeking avoidance of release to show express or implied exceptions thereto is inapposite to the issue here presented. Furthermore, it virtually begs the question in a situation such as this where the issue is the determination of the breadth and scope of the release agreement. It cannot be merely assumed that the settlement here agreed upon by the parties was "general."

■ Finally, it is noted that the theory propounded by the taxpayer is further complicated by the fact that he is asserting that a settlement was concluded by the Attorney General which was, in fact, beyond his authority to bind the Government. As the Government notes in its brief, the excess tax liability dispute was with the Commissioner of Internal Revenue and such liabilities cannot be compromised by the Attorney General or the Department of Justice unless and until the Commissioner refers same to the Department for prosecution or defense. Internal Revenue Code of 1954, Section 7122(a); Internal Revenue Code of 1939, Section 3761(a). Prior to such reference to the Department of Justice, Congress has prescribed action by the Secretary of the Treasury or his delegate as the "exclusive method by which tax cases could be compromised." Botany Worsted Mills v. United States, 278 U.S. 282, 288, 289, 49 S.Ct. 129, 73 L.Ed. 379 (1929); Royal Indemnity Co. v. United States, 313 U.S. 289, 294–295, 61 S.Ct. 995, 85 L.Ed. 1361 (1941). A party entering into an arrangement with a representative of the United States has the responsibility of ascertaining whether that representative acts within the bounds of his authority. This is so where the scope of this authority is explicitly defined by Congress or limited by delegated legislation, properly exercised through the rule-making power. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Judgment is therefore ordered affirming the order of the District Court.

Affirmed.