THOMAS J. BALL AND MARY J. BALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ball v. Commissioner
Docket No. 18392-80.
United States Tax Court
T.C. Memo 1984-218; 1984 Tax Ct. Memo LEXIS 456; 47 T.C.M. (CCH) 1684; T.C.M. (RIA) 84218; April 25, 1984. Peter G. Loftus, for the petitioners. Alan E. Cobb, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Additions to Tax
Year
Deficiency
[1] Section 6653(b) Section 6653(a)
1970
$22,484.21
$11,242.11
1971
24,032.80
12,016.40
1972
37,628.19
18,814.09
1973
28,093.64
14,046.82
1974
15,068.85
7,534.42
1975
2,577.76
$128.89
The issues for decision are as follows: (1) whether certain amounts received by petitioners constitute income to the petitioners, and, if so, whether petitioners may deduct under *458 section 162(a) payments made to school district officials to whom petitioners sold products; (2) whether petitioners understated their taxable income in the years 1970 through 1975 as set out in the margin; [2] (3) whether any part of the underpayment of tax in each of the years 1970 through 1974 was due to fraud pursuant to section 6653(b); (4) whether any part of the underpayment of tax for the year 1975 was due to negligence or intentional disregard of rules and regulations pursuant to section 6653(a); and (5) whether petitioner Thomas J. Ball was granted immunity from the imposition of the civil fraud addition and interest on any underpayment of Federal income taxes. *459 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. The petitioners were residents of Scranton, Pennsylvania when they filed their petition in this case. Petitioners filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center in Philadelphia, Pennsylvania. They reported their income and deductions in accordance with the cash receipts and disbursements method of accounting. During the years in issue, petitioner Thomas J. Ball (hereinafter sometimes referred to as Thomas or as petitioner) was the sole proprietor of Scranton Maintenance Supply Co. (hereinafter referred to as SMSC). Petitioner sold primarily maintenance, office and janitorial supplies, and furniture to school districts and other customers in the Scranton, Pennsylvania area. Thomas began this business in 1964. The furniture-selling business of SMSC was operated at times under the name of Emjay Furniture Co. [3]
Thomas maintained three business bank accounts *460 during the years in issue. One account was at the Third National Bank and Trust Company of Scranton, Pennsylvania (hereinafter Third National) under the name of "Scranton Maintenance Supply Co." Another account in the name of "Scranton Maintenance Supply Co." was with the South Side Bank and Trust Company, also in Scranton (hereinafter South Side), later known as Penn Security Bank and Trust Company (hereinafter Penn Security). The Penn Security account was closed in mid-1974. The accounts at Third National and South Side (later Penn Security) were used for the deposit of receipts from Thomas' SMSC business. The third business account under the name of "Emjay Furniture Co." was at the Fidelity Deposit and Discount Bank in Dunmore, Pennsylvania. This account was opened in January 1971 and was used to deposit receipts from the sales of furniture in Thomas' SMSC business during the years 1971 and 1972. Petitioners also maintained a personal account under the name of "Thomas and Mary Ball" at Third National throughout the years in issue. In 1971 petitioners made one large deposit of sales receipts from Thomas' SMSC business into their personal account. Thomas made numerous deposits *461 of sales receipts into his account at South Side (later Penn Security) during the years 1970 through 1974. The business receipts deposited into this account were not reported on petitioners' Federal income tax returns for the taxable years 1970 through 1974. Thomas did not keep books and records of his SMSC business income or expenses during the years in issue other than certain bank records and some invoices. Petitioners, who prepared their own returns, reported on their returns the following receipts and expenses from the SMSC business: [4]
SMSC
1970
1971
1972
Cross Receipts
$46,670.00
$48,876.00
Cost of Goods
Sold
36,804.75
38,398.00
Gross Income
a $11,220.00
9,865.25
b 11,478.00 *462 Deductions
3,396.16
586.00
990.84
Net Profit
$ 7,823.84
$ 9,279.25
$10,487.16
SMSC
1973
1974
1975
Gross Receipts
$56,286.00
$139,448.96
$151,632.38
Cost of Goods
Sold
40,203.00
99,477.98
109,109.51
Gross Income
16,083.00
39,970.98
42,522.87
Deductions
4,154.00
22,676.36
23,500.92
Net Profit
$11,929.00
$ 17,294.62
$ 19,021.95
Respondent determined the gross receipts of Thomas' SMSC business in 1970 through 1975 by the bank deposits method and by adding various specific items of nondeposited business receipts. Respondent determined SMSC's inventory figures, purchases and expenses for the years in issue by examining bank statements, cancelled checks and purchase invoices. The following figures were determined by respondent: SMSC
1970
1971
1972
Gross Receipts a
$175,285.79
$178,970.72
$233,121.09
Cost of Goods
Sold
100,709.20
96,541.51
124,516.66
Gross Income
$ 74,576.59
$ 82,429.21
$108,604.43
Deductions a
8,695.07
12,208.18
13,389.35
Net Profit
65,881.52
70,221.03
95,215.08
Net Profit
Reported
7,823.84
9.279.25
10,487.16
Unreported
Net Profit
$ 58,057.68
$ 60,941.78
$84,727.92
SMSC
1973
1974
1975
Gross Receipts a
$234,283.12
$213,408.49
$163,401.19
Cost of Goods
Sold
139,375.93
134,137.86
112,245.67
Gross Income
$ 94,907.19
$ 79,270.63
$ 51,155.52
Deductions a
14,979.60
23,576.18
24,202.41
Net Profit
79,927.59
55,694.45
26,953.11
Net Profit
Reported
11,929.00
17,294.62
19,021.95
Unreported
Net Profit
$ 67,998.59
$ 38,399.83
$ 7,931.16
*463 Petitioners did not receive any nontaxable receipts that they deposited into their business accounts (other than the amount in dispute in Issue 1). Sometime after beginning his SMSC business, Thomas submitted bids to certain Pennsylvania school districts to sell products and furniture; but the bids were generally not accepted. Eventually, sometime in the 1960's, Thomas learned from certain school district officials that in order to do business with their school districts payments would have to be made to particular officials. The amount of the required payment varied with the merchandise actually delivered to the school districts and was determined by an approximate agreed-upon formula. Thomas retained the cost of the merchandise actually delivered plus approximately 20 percent of the cost of such merchandise.On furniture sales, the additional amount retained was approximately 10 percent. The amount of merchandise or furniture actually delivered by Thomas *464 to the school districts was less than the amount specified in the contract. The difference between the contract price paid by the school districts and the amount retained by Thomas, as computed above, was turned over to a member of the contracting school district's school board. The amount of the payments averaged approximately 10 to 15 percent of the contract prices. Thomas dealt with only one member of the board at a time. During the years in issue, Thomas turned over to the following persons a portion of the sales made to the following school districts: School District
Payee
Years
Dunmore
Joseph McCool
70-74
Hanover Township
Bill Wint
70-73
Greater Nanticoke
Area
Maro Nardozza
70-72
Greater Nanticoke
Area
Mike Danko
73-74
Pittston Area
Len Wendalowski
70-74
Mid Valley
Andres Miscovic
70-74
In almost every case, after Thomas received the full amount of the contract price from the school district, he deposited the amount received into his South Side (later Penn Security) account. In order to obtain cash to give to the school district officials the portion of the contract price that was owing to them, Thomas went to the bank and drafted *465 a countercheck [5] on the account. In almost every case he did so on the same day or within several days of the deposit of the receipts. The countercheck generally was in the amount of the payment to the school district officials, or, in an amount slightly greater (rarely more than $200) than the payment, in which case Thomas would retain the remainder of the cash for his personal use. Thomas destroyed all the counterchecks after they had been returned to him by the bank. Counterchecks for the following yearly totals were used to obtain cash for the school district officials: Counterchecks
Year
Number Drafted
Total Amount
1970
7
$13,200
1971
6
15,000
1972
7
27,850
1973
6
23,300
Thomas' practice of turning over amounts to school district officials ceased during the summer of 1974, when a grand jury investigation was begun. In July 1974 Thomas was called to testify before a grand jury of the United States investigating possible violations by the Dunmore school district directors of 18 U.S.C. sec. 1951 (1970). [6] When Thomas *466 was called to testify, he invoked his Fifth Amendment privilege against self-incrimination. *467 Thomas, through his attorney, requested of the Assistant United States Attorney, Mr. Cognetti, that he be granted immunity from all tax penalties and interest, in addition to immunity from criminal prosecution. Mr. Cognetti was willing to provide Thomas with as much immunity as he could in order to elicit his testimony. In requesting the Attorney General's office to grant Thomas immunity, Mr. Cognetti sent by teletype on July 11, 1974, the following information to the Justice Department in Washington, D.C.: (C) WHAT WITNESS WANTS IN RETURN FOR HIS TESTIMONY. IN RETURN FOR HIS TESTIMONY, HE WANTS: 1--TOTAL IMMUNITY AS TO THIS INVESTIGATION; 2--CRIMINAL TAX IMMUNITY FOR INCOME TAX EVASION, BUT WITH THE PROVISION THAT HE MAKE FULL RESTITUTION.
INCOME TAX IMMUNITY ARISES BECAUSE THE SCHEME BY WHICH HE MADE THE KICKBACKS MADE IT POSSIBLE TO EVADE * * * INCOME. WE DO NOT KNOW HOW THIS WAS DONE, AT THIS TIME. HIS ATTORNEY HAS INFORMED US THAT HE HAS NO CRIMINAL RECORD, AND THAT IF INTERVIEWED BY THE F.B.I., OR CALLED BEFORE THE GRAND JURY, HE WOULD TAKE THE 5TH AMENDMENT. * * * [Emphasis added.] By letter dated August 26, 1974, Mr. Cognetti informed petitioners' *468 attorney "that the United States Attorney's Office has been informed that Henry Peterson, Assistant Attorney General, has authorized immunity for Mr. Ball." On April 24, 1975, a motion was filed in the United States District Court for the Middle District of Pennsylvania by the United States Attorney for the Middle District of Pennsylvania, which states, in part, the following: S. JOHN COTTONE, United States Attorney for the Middle District of Pennsylvania, hereby moves this Court to issue an order pursuant to the provisions of Title 18, United States Code, Section 6001 et seq., compelling Thomas Ball to give testimony or provide other information, which he refuses to give or provide on the basis of his privilege against self incrimination, as to all matters about which he may be interrogated before the grand jury of the United States presently empaneled within this District, which grand jury is investigating possible violations of Title 18, United States Code, Section 1951 by the Dunmore School Directors, and your petitioner respectfully alleges as follows: * * * 4. This application was approved prior to his retirement by Henry *469 Peterson, Assistant Attorney General in charge of the Criminal Division of the Department of Justice, pursuant to the authority vested in him by 18 U.S.C. 6003 and 28 C.F.R. 0.175. [Emphasis added.] The order dated April 24, 1975, of the District Court provides, in part as follows: On motion of J. JOHN COTTONE, United States Attorney for the Middle District of Pennsylvania, filed in this matter on April 24, 1975; And it appearing to the satisfaction of the Court: * * * 4. That the aforesaid Motion filed herein has been made with the approval of the Assistant Attorney General in charge of the Criminal Division of the Department of Justice, pursuant to the authority vested in him by 18 U.S.C. 6003 and 28 C.F.R. 0.175: NOW, THEREFORE, IT IS ORDERED pursuant to 18 U.S.C. 6002 that the said Thomas Ball give testimony or provide other information which he refuses to give or to provide on the basis of his privilege against self incrimination as to all matters about which he may be interrogated before said grand jury. [Emphasis added.] ULTIMATE *470 FINDINGS OF FACT (1) Petitioners received $12,100 in 1970, $14,100 in 1971, $26,750 in 1972 and $22,400 in 1973 as agents of school district officials; consequently these amounts are not includable in their income. (2) Petitioners understated their taxable income by $40,987.05 in 1970, $41,675.18 in 1971, $55,828.84 in 1972, $42,759.64 in 1973, $38,757.29 in 1974, and $5,889.52 in 1975. (3) The underpayment of tax in each of the years 1970 through 1974 was due to fraud pursuant to section 6653(b). (4) The underpayment of tax for the year 1975 was due to negligence or intentional disregard of rules and regulations pursuant to section 6653(a). OPINION Issue 1 -- Income or Deduction
Petitioners contend that they had no claim of right to the amounts paid them by the school districts that they turned over to the school board officials, but that they acted solely as agents of these officials.Consequently, they contend that such amounts are not includable in their income. Alternatively, petitioners contend that the amounts turned over to the officials are ordinary and necessary business expenses deductible under section 162(a) and that respondent has not met his burden *471 of proving that the payments fall within section 162(c)(1). [7]
Respondent does not address petitioners' first argument and instead contends solely that the amounts turned over by petitioners to school board officials are not deductible under section 162(a) because of the operation of section 162(c)(1). Were it not for petitioners' first argument, *472 we might agree with respondent. However, we think that Thomas was acting as an agent of the school district officials when he received the money and subsequently turned it over to the officials. Consequently, because they had no claim of right to the amounts paid to the school district officials, these amounts do not constitute income to petitioners. Amounts received under a claim of right or without restrictions as to disposition must be included in gross income. North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). Conversely, amounts are not treated as income where the taxpayer does not receive the funds under a claim of right because the taxpayer is required to transmit the funds to someone else as a mere conduit or agent. Goodwin v. Commissioner,73 T.C. 215, 230 (1979); Diamond v. Commissioner,56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). See also shaara v. Commissioner,T.C. Memo. 1980-247; Pierson v. Commissioner,T.C. Memo. 1976-281. In Lashells' Estate v. Commissioner,208 F.2d 430 (6th Cir. 1953), *473 revg. in part and affg. in part a Memorandum Opinion of this Court, the taxpayer was a partner in a partnership that arranged for certain work to be performed for a corporation. The partnership did not do the work itself, but used sub-contractors. The purchasing agent of the corporation made an arrangement with the taxpayer whereby the taxpayer's partnership would bill the corporation at a price of $1 to $2 per unit more than the sub-contractors' price. The $1 to $2 per unit amount would then be turned over to the purchasing agent without knowledge on the part of the purchasing agent's employer. At the time the agreement was consummated, no profit on these transactions was contemplated by the taxpayer. However, one transaction actually resulted in a profit of $8,108.75 inuring to the taxpayer's partnership. The issue was whether the $1 to $2 per unit commissions were income that should have been included on the partnership's and, consequently, the taxpayer's returns. The Court of Appeals for the Sixth Circuit held that such amounts did not represent statutory gain to the taxpayer's partnership because there was no claim of right to these amounts, which were charged, collected *474 and paid by the partnership as an agent of the purchasing agent. The Court of Appeals reasoned as follows: Although there may have been no enforceable obligation on its part to pay them [the agreed-upon amounts] to Moon [the purchasing agent] after the collection by the Company, [the partnership] nevertheless the evidence shows without question that such was the agreement and that the agreement was promptly carried out. The absence of an enforceable obligation to pay the money to some one else is only one of the two conditions necessary to constitute income. There must also exist a "claim of right" on the part of the taxpayer. The performance of the agreement, whether legally enforceable or not, negatives the "claim of right." The amounts collected under the agreement with Moon were not used in the Company business, were never claimed by the Company as anything other than money to which Moon was entitled, and was in no sense money to which the Company made a claim of right in opposition to the claims of Moon. [Emphasis added, 208 F.2d at 435.] We applied the holding of the Lashells' case in Brown v. Commissioner,T.C. Memo. 1977-100. *475 In Brown, the taxpayers were partners in a partnership and shareholders of a subchapter S corporation. The partnership and corporation entered into a contract to perform services for Georgia Water and Utility Co. (Georgia Water). Acting through one Mr. Brown (not the named taxpayer), Georgia Water paid the taxpayers their costs and expenses plus an additional amount. The additional amount was immediately kickbacked to Mr. Brown by check payable to Mr. Brown's wholly owned corporation. Citing Lashells' Estate,supra, we held that the additional amounts received by the partnership and corporation did not constitute income to these entities and, therefore, the taxpayers were not taxable on such amounts because the entities had no claim of right to these amounts, but were acting as mere conduits through which the funds flowed from Georgia Water to Mr. Brown. The taxpayers received no economic benefit from the additional amounts and merely served as a "bank account" through which the funds were funnelled to Mr. Brown's corporation. Applying the rationale of these cases to the record before us, we are convinced that petitioners received the kickbacked amounts *476 in question as agents or mere conduits of the school board officials and had no claim of right to these funds. When petitioner Thomas contracted to do business with the school districts, certain school board members instigated a scheme whereby they required Thomas to funnel to them funds from the school districts. The school board members required Thomas to turn over to them approximately ten to fifteen percent of the contract price. [8] Pursuant to the school board officials' instructions, Thomas billed the school districts for supplies or furniture that were never delivered (nor ordered by the school board districts) and then promptly (almost always within one to three days of receiving payment from the school district) delivered the funds to the school board members. The transferred funds were never set aside for petitioners' benefit. Thus, petitioners had no gain from the funds that were funnelled from the school district's coffers, through Thomas, to the school board members. *477 In Lashells' Estate,supra, the Sixth Circuit Court of Appeals focused on the taxpayer's lack of intent to make a gain or profit, as follows: Both transations were entered into [by the taxpayer] without any intention of making a gain or profit, and the plating transaction was actually consummated without the making of any profit. The unexpected profit of $8,108.76 in the tank transaction is taxable income and should have been reported, but with that eliminated from the picture, the remainder of the transaction followed the original pattern of a non-profit transaction. * * * [208 F.2d at 435.] We think that in order to determine whether a gain or profit was intended, the focus is on the transaction for which the taxpayer served as an agent or mere conduit, rather than on the contract as a whole. Therefore, in the instant case, the fact that petitioners intended to and did make a profit on only that portion of the contract representing the difference between the price of goods actually delivered and the petitioners' cost for them does not affect *478 our result reached herein. In focusing on the transfers from Thomas to the school board officials, no profit was intended to be made by petitioners. Our conclusion is also consistent with Nunez v. Commissioner,T.C. Memo. 1969-216 (taxpayers taxable on profits they received for participation in kickback scheme and not taxable on amounts received and disbursed on behalf of payor of kickbacks). [9] Consequently, the kickbacked amounts do not constitute income to the petitioners and we do not reach the issue of whether the payments were deductible under section 162(a). *479 The remaining question is what was the amount that Thomas turned over to the school district officials. When Thomas used a countercheck to obtain the cash that he turned over to the officials, he also obtained some petty cash for his own use. The amount retained was not turned over to the officials per the agreement and remains in income. Using our best judgment, we hold that the total amounts that Thomas turned over to the school districts officials are as follows: $12,100 in 1970; $14,100 in 1971; $26,750 in 1972; and $22,400 in 1973. Issue 2 -- Understatement of Taxable Income
The petitioners did not keep adequate books and records for Thomas' SMSC business for the years in issue. Respondent determined Thomas' SMSC business gross receipts in 1970 through 1975 by the bank deposits method and by adding various specifically identified items of nondeposited business receipts.The bank deposits method is an acceptable method that may be used to reconstruct a taxpayer's income. C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882 (1970); Harper v. Commissioner,54 T.C. 1121 (1970). *480 By using this method, if respondent determines that a taxpayer's income was understated, the taxpayer has the burden of proving that respondent's determination is erroneous. Jones v. Commissioner,29 T.C. 601 (1957). In the instant case, pursuant to Rule 91, [10] the parties stipulated to the following: 24.Respondent determined SMSC's gross receipts in 1970 through 1975 by the bank deposits method and by adding various specifically identified items of nondeposited business receipts. These figures, which petitioners do not dispute, are reflected in Exhibits A, [11] A2 and A3 of respondent's notice of deficiency. 25. Respondent determined SMSC's inventory figures, purchases and expenses for the issue years by examining (with the aid of petitioners), bank statements, cancelled checks and purchase invoices. These figures, which petitioners do not dispute, are reflected in Exhibits A1, A2 and A3 of respondent's notice of deficiency. On brief, petitioners contend that the only thing that the Petitioner stipulated to in regard to these figures is "Gross Receipts for 1970 were determined by respondent as follows." In no place in the Stipulation does it state *481 that those findings were accurate or correct. Respondent contends that the stipulation must be interpreted as an agreement by the petitioners that respondent's figures are correct. We agree with respondent. Rule 91(e) provides as follows: BINDING EFFECT: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * * We think that, by using the phrase "[t]hese figures, which petitioners do not dispute," the parties agreed to the accuracy of respondent's figures. Petitioners entered into this stipulation after having had the opportunity to review the work papers of respondent's revenue agent. [12] *482 Moreover, the parties also stipulated to certain bank records that tend to support the stipulated figures. Thus, pursuant to Rule 91(e), we will not permit petitioners to qualify or contradict this stipulation. [13]
*483 Therefore, we sustain respondent's determination of gross receipts (less amounts not includible in income as discussed in Issue 1), cost of goods sold and expenses generated by Thomas' business. Petitioners' understatements of taxable income for the years in issue, as redetermined, are as follows: $40,987.05 in 1970; $41,675.18 in 1971; $55,828.84 in 1972; $42,759.64 in 1973; $38,757.29 in 1974; and $5,889.52 in 1975. [14]
*484 Issue 3 -- Fraud Addition
Respondent determined that part of petitioners' underpayment of tax for the taxable years 1970 through 1974 was due to fraud, and thereby imposed an addition to tax under section 6653(b). Petitioners contend that (1) respondent has not met his burden of proving that fraud exists, [15] and (2) that petitioner Thomas has been granted immunity from liability for the civil fraud addition.Petitioners' second contention is addressed in Issue (5). Here we address the issue of whether respondent has proven by clear and convincing evidence for each of the years in issue that some part of the underpayment of tax was due to fraud. See section 7454(a); Rule 142(b); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Hebrank v. Commissioner,81 T.C. 640 (1983).This issue involves questions of fact. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Stratton v. Commissioner,54 T.C. 255, 284 (1970), modified on another issue 54 T.C. 1351 (1970). *485 Fraud is never imputed or presumed and a mere suspicion is insufficient to sustain a finding of fraud. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud must be affirmatively established. Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court. "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939).In order to establish fraud, the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection thereof. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). In our *486 judgment the evidence in this case establishes in a clear and convincing manner that the tax underpayments for the years 1970 through 1974 result from fraud with intent to evade taxes on the part of petitioners. It is well settled that a consistent failure to report substantial amounts of income over a number of years is effective evidence of fraudulent intent. Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Schwarzkopf v. Commissioner,246 F.2d 731 (3d Cir. 1957), affg. in part a Memorandum Opinion of this Court. In the instant case we have found that petitioners understated their taxable income by the following amounts: $40,987.05 in 1970; $41,675.18 in 1971; $55,828.84 in 1972; $42,759.64 in 1973; and $38,757.29 in 1974. Petitioners prepared their own returns and reported adjusted gross income of $7,823.84 in 1970 and of $9,384.45 in 1971 and taxable income as follows: $6,741.73 in 1972; $8,059.98 in 1973; and $11,610.70 in 1974. Further significant evidence of fraudulent intent are Thomas' own admissions. *487 On August 26, 1974, Thomas testified before respondent's agents with regard to the grand jury investigation being conducted at that time. [16] His testimony was as follows (questions by respondent's agents, answers by Thomas): 76. Q. You mentioned you use The Penn Security Bank in connection with your dealings with Dunmore. A. Dunmore and all of the large accounts. Penn Security we'd use as a sort of dummy bank account. That's the stuff I never declared. * * * 109. Q. * * * How frequently did you put deposits in this account [South Side, later known as Penn Security]? * * * A. Oh, average? Let's say twice a month. What I did at the Penn Security--all the big accounts, all these bigger bids, which I didn't declare that I was trying to hide from the I.R.S., I put in the South Side Bank. * * * * * * 177. Q. Now, if I understood you correctly, previously, and correct me if I'm wrong the amounts you received from the school districts where there were kickbacks involved would be deposited in Penn Security… A. All of it. 178. Q. … and, therefore, would not appear on your return as part of the gross receipts figure on that return? Is that correct? *488 A.None of it. Right. * * * 455. Q. How about this Kehoe [sic] Plan? A. Never took advantage of it. Like I said, I was stealing enough. I knew what I was doing was wrong but I took off enough there and I didn't want to take off any more. I didn't like I said, take any deductions for my apartment. * * * *489 Thomas also testified as a government witness in November 1975 at the criminal trial of United States v. Joseph McCool, et al, No. 75-91 Criminal, in the United States District Court for the Middle District of Pennsylvania. Excerpts from his testimony are as follows (upon cross-examination by the defendant's counsel): Q. Where was that account? A. Down at the South Side Bank. This is an account I never turn in to the income tax bureau, for which I am in trouble now and must pay taxes possibly and interest. I have no immunity from that. Q. Let me ask you this: You stated that the account that you had at the Penn Security Bank, which is the South Side Bank in Scranton was a cover for pay-offs, is that right?
A. No, not necessarily pay-offs, let me rephrase that and say it was sales that I was not showing to the IRS. Q.In other words, all it was was a place where you are hiding money from the government, is that right? A. It was a place where I was stealing it, I was trying to steal it, right. * * * Q. I will be very brief. You have said, I think, once or twice that the accounts at the South Side and the Penn Security Bank * * * was opened as a cover, *490 is that correct? A. Yes, more or less. Q. And it was a cover-- A. It was a cover of returns and total sales. You understand this account in the bank was not my money, this was total sales. There was expenses to pay out of that, there was merchandise to pay for out of that. This is a deposit made over this period of time that I did not put in the Third National Bank because I was not going to declare it. Q. And you said that that is one of the purposes, at least, for that account, was for the purpose of pay-off, right? A. No, sir. Q. It wasn't for that purpose? A. If I did, then I stand corrected. That was the purpose to hide that money so I wouldn't have to turn it in to Uncle Sam. [Transcript at 363 to 364 and 390 to 391.] Thomas' testimony as quoted about reveals that he knew that the sales receipts were taxable and that he failed to report the income on the returns because he desired to evade the payment of income taxes. See Bradbury v. Commissioner,T.C. Memo. 1971-63, wherein we upheld a fraud addition based, in part, upon the taxpayer's admissions of intent to evade the payment of income taxes. We also note that petitioners *491 were under an obligation to maintain books and records adequate for the computation of their tax liability. Sec. 1.6001-1, Income Tax Regs. Thomas' testimony, as quoted above, shows that he totally ignored this responsibility. His violation of this duty by failing to keep records of income realized from sales indicates a desire to conceal income and constitutes further evidence of fraudulent intent. Estate of Upshaw v. Commissioner,416 F.2d 737 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121 (1970). Issue 4 -- Negligence Addition
Respondent made certain adjustments to petitioners' 1975 Federal income tax return (see fn. 2, supra), including an increase of $7,931.16 to petitioners' taxable income from Thomas' SMSC business, and determined a negligence addition to the tax. Petitioners bear the burden of proving that the underpayment of tax was not due to negligence or intentional disregard of rules and regulations. Rule 142(a); Enoch v. Commissioner,57 T.C. 781 (1972). *492 Petitioners have offered no evidence to explain the omission of income. Consequently, we hold that they are liable for the negligence addition under section 6653(a) for the taxable year 1975. Issue 5 -- Immunity
Petitioners' primary argument against imposition of the fraud addition is based upon their contention that Thomas was granted by the United States Department of Justice immunity from prosecution that encompasses the civil fraud additions to tax and interest on Federal income taxes. Respondent contends that the immunity granted to Thomas by the Justice Department was a grant of immunity from criminal prosecution only and in no way extends to this civil tax proceeding. We agree with respondent. The immunity that was requested by the Attorney General and that was the subject of the order of the United States District Court for the Middle District of Pennsylvania was granted pursuant to 18 U.S.C. sec. 6001 et seq. (1982). The information compelled under this order may not be used against the witness to whom immunity is granted in criminal cases only. [17] Both the grant of immunity and the Fifth Amendment privilege against self-incrimination *493 apply only to criminal cases and the fraud addition to tax of section 6653(b) is purely a civil addition. Ryan v. Commissioner,568 F.2d 531, 541-542 (7th Cir. 1977), affg. and remanding 67 T.C. 212 (1976); see Helvering v. Mitchell,303 U.S. 391, 401 (1938); Brod v. Commissioner,65 T.C. 948, 955 (1976). *494 The remaining issue is whether the Assistant United States Attorney orally compromised the civil fraud addition and interest on the tax liability under section 7122(a). [18] We think not. [19]
The *495 compromise agreement is a contract, and thus, is governed by the rules applicable to contracts. United States v. Feinberg,372 F.2d 352, 361 (3d Cir. 1967), affg. on rehearing 372 F.2d 352 (3d Cir. 1965); United States v. Lane,303 F.2d 1, 4 (5th Cir. 1962). To constitute a contract, there must be an offer and an acceptance. Thomas, through his attorney, requested a compromise of the civil fraud addition and interest. But we can find no acceptance by the Government on the record in this case. Mr. Cognetti, the Assistant United States Attorney handling the case, sent a teletype directed to the Attorney General's office that requested "Criminal tax immunity for income tax evasion, but with the provision that he make full restitution." (Emphasis added.) Also, the motion filed by the United States Attorney for the Middle District of Pennsylvania pursuant to the authority vested in him by " 18 U.S.C. 6003," requested that an order be issued granting immunity "pursuant to the provisions of Title 18, United States Code, Section 6001 *496 et seq." (Emphasis added.) We think it clear from our examination of the record and the testimony of the witnesses before us that the Justice Department personnel involved in this case intended that Thomas receive the immunity provided in 18 U.S.C. sec. 6002 (1982)--no more, no less. Petitioners rely upon the testimony of Mr. Cognetti who testified in the instant case that he thought the immunity granted would cover "penalties and interest." [20] We think that petitioners' present reliance upon this testimony is misplaced because it merely represents the personal views of the witness on the scope of the immunity granted under 18 U.S.C. sec. 6001 et seq. (1982). We think that the record as a whole evidences that all the participants of the Justice Department, including Mr. Cognetti, intended to act and did properly act under the authority of Title 18 (and not Title 26) of the United States Code. The after-the-fact personal opinion of Mr. Cognetti as to the scope of the immunity contained in 18 U.S.C. sec. 6002 (1982) is inadequate to alter our determination of whether an acceptance by the Government was made *497 of petitioner's offer. On the entire record we find no "meeting of the minds" here. We hold for respondent on this issue. *498 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. In the notice of deficiency, respondent computed the understatements as follows: Adjustments
1970
1971
1972
Additional income
$57,390.69 $60,032.29 $84,267.36 Rental Profit
or Loss
(1,595.41)
(732.11)
(1,309.66)
Capital Gains
and Losses
166.77 34.29 Standard Deduction
(1,000.00)
(1,500.00)
(413.15)
Exemptions
(1,875.00)
(2,025.00)
Individual Retirement
Arrangement
Total Adjustments--
Understatement
$53,087.05 $55,775.18 $82,578.84 ↩
Adjustments
1973
1974
1975
Additional income
$68,585.18 $38,491.60
$7,931.16 Rental Profit
or Loss
(3,324.07)
265.69
(44.93)
Capital Gains
and Losses
79.12 Standard Deduction
(180.59)
(2,600.00)
Examptions
(2,250.00)
Individual Retirement
Arrangement
2,853.29 Total Adjustments--
Understatement
$65,159.64 $38,757.29
$5,889.52 3. Unless otherwise stated, references to the SMSC business will include Thomas' furniture-selling business.↩
4. Thomas' "approximations" of businees receipts and expenses for the years 1970 through 1974 to not correspond with any of the figures determined by respondent below.↩
a. Petitioners reported only the gross income figure this year. ↩
b. A mathematical error of $1,000 appears to have been made.↩
a. The entire contract price on sales made to school districts was included in gross receipts and no deduction was allowed for any money turned over to various school district officials, as will be described below.↩
5. A countercheck is a check supplied by the bank to be used solely for cash withdrawals.↩
6. § 1951.INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE. (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do * * * shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. (b) As used in this section-- * * * (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction. * * * Certain school district officials were prosecuted and convicted for violations of this statute.↩
7. SEC. 162. TRADE OR BUSINESS EXPENSES. (c) ILLEGAL BRIBES, KICKBACKS, AND OTHER PAYMENTS.-- (1) ILLEGAL PAYMENTS TO GOVERNMENT OFFICIALS OR EMPLOYEES.--No deduction shall be allowed under subsection (a) for any payment made, directly or indirectly, to an official or employee of any government, or of any agency or instrumentality of any government, if the payment constitutes an illegal bribe or kickback * * *. The burden of proof in respect of the issue, for the purposes of this paragraph, as to whether a payment constitutes an illegal bribe or kickback * * * shall be upon the Secretary or his delegate to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).↩
8. Accord, McCool v. Commissioner,T.C. Memo. 1984-33. In McCool↩ we imposed the fraud addition to tax upon a Dunmore, Pennsylvania School Board official who failed to report kickbacks received from various individuals, including petitioner Thomas.
9. See also Pew v. Commissioner,T.C. Memo. 1961-264, wherein we determined that "kickbacks" paid to an employee of the taxpayer's client are not income to the taxpayer. To the extent that Pew relies on an agency or mere conduit theory, it has not been overruled by Alex v. Commissioner,70 T.C. 322 (1978), affd. 628 F.2d 1222 (9th Cir. 1980) (in order to claim an exclusion from gross income based upon an adjustment to the purchase price resulting from a discount or rebate, the arrangements for the discount or rebate must be made by the seller directly with the buyer). Respondent's position with regard to Pew is found in Rev. Rul. 62-194, 1962-2 C.B. 57, which states that respondent will not follow Pew.↩
10. All references to rules are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩
11. Exhibit "A" referred to herein should be Exhibit "A1".↩
12. On October 29, 1981, respondent served a copy of a written request for admissions to petitioners. After receiving no response to the request for admissions, respondent filed a motion for summary judgment on December 15, 1981. A hearing was held on April 21, 1982. On April 29, 1982, this Court ordered respondent to furnish petitioners' counsel all of the work papers and documents relevant to respondent's bank deposits analysis. We further ordered the parties to meet and stipulate to the extent possible regarding the bank deposits analysis. The stipulation quoted above was filed by the parties at trial on March 25, 1983. ↩
13. Despite the stipulation, petitioners attempted to present evidence concerning the amount of unreported income by means of Thomas's testimony. Under Jasionowski v. Commissioner,66 T.C. 312, 318↩ (1976), this Court has discretion not to be bound by the stipulation where facts presented at trial are "clearly contrary" to those stipulated to by the parties. Although we think that Thomas was a credible witness, his vague testimony on this issue and lack of any documentation falls far short of providing facts that are clearly contrary to those stipulated to by the parties.
14. During the years in issue, petitioner did not report income or loss from rental of snowmobiles (years 1970 through 1972), rental of apartment buildings (years 1970 through 1973) and sales of Christmas trees (years 1971 through 1973). In "Petitioners' Response to Respondent's Request for Admissions" filed on December 28, 1981, petitioners admitted that the net income or loss from these activities was accurately determined in respondent's notice of deficiency. Petitioners also admitted that they had net long term capital gains in 1970, 1972 and 1973, which they failed to report on their tax returns for said years, in the amounts determined by respondent in the notice of deficiency. Under Rules 90(e) and 91(e), these matters admitted are conclusively established. Respondent determined additional income in the form of dividends and interest for the years in issue and disallowed a section 219 deduction for the year 1975.Petitioners presented no evidence regarding these issues. Therefore, they have failed to carry their burden of proving respondent's determinations erroneous. Rule 142(a)↩.
15. Part of petitioners' argument here is that respondent has not met his burden of proving that an underpayment exists by relying upon the parties' stipulation. We have addressed this argument in Issue 2.↩
16. The parties attached as Joint Exhibit 19-S a copy of the transcript of this testimony, stipulating that it was a true and correct copy. The parties reserved the right to rebut or corroborate by additional evidence the truth of the assertions contained therein.Petitioners did not offer any rebuttal evidence. Respondent obtained access to the grand jury materials pursuant to two District Court orders under Rule 6(e) of the Federal Rules of Criminal Procedure, dated July 30, 1974, and January 26, 1976. Petitioners raised no objections in the instant case to respondent's use of these materials with regard to the recent Supreme Court opinions in United States v. Sells Engineering, Inc.,463 U.S. 103 S. Ct. 3133 (1983) and United States v. Baggot,463 U.S.    , 103↩ S. Ct. 3164 (1983). Therefore, under the facts in this case, respondent's use of these materials is not in question.
17. The scope of the immunity granted is found in 18 U.S.C. sec. 6002 (1982), which provides, in part, the following: § 6002. Immunity generally
Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to-- (1) a court or grand jury of the United States, * * * and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order. [Emphasis added.] The immunity sections discussed herein appearing in Title 18 in the 1982 edition are in all pertinent respects the same as those in effect during the years 1974 and 1975.↩
18. SEC. 7122. COMPROMISES. (a) AUTHORIZATION.--The Secretary or his delegate may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense. ↩
19. The basis for petitioners' contention that Thomas was granted immunity encompassing the civil fraud additions and interest is somewhat vague and appears to center upon the scope of the immunity sections in 18 U.S.C. sec. 6001 et seq. (1982) only. The parties have not framed the immunity issue in terms of section 7122(a). However, due to the nature of this issue and for the sake of completeness, we have also examined section 7122(a)↩.
20. Because of our resolution of this issue we need not address the question of whether the Attorney General has the authority to compromise a nascent civil tax liability that has not yet been determined by the Commissioner under section 7122(a). See Brubaker v. United States,342 F.2d 655 (7th Cir. 1965); Dubravski v. Commissioner,T.C. Memo. 1980-17 (the Attorney General has no authority to compromise a civil tax liability dispute until the Commissioner refers it to the Department of Justice for prosecution or defense). But see United States v. Barrett,505 F.2d 1091 (7th Cir. 1974) (Attorney General has authority to compromise a civil tax liability arising from the same transactions as the criminal tax charges involved). We also need not address the issue of whether such authority, if it existed, was redelegated to the Assistant United States Attorney.See 28 C.F.R. sec. 0.168 (1974) (covering offers in compromise that may be accepted by Assistant Attorney Generals) and 28 C.F.R. sec. 0.168 (1974)↩ (redelegation by Assistant Attorney Generals).